[Civ. No. 51055. First Dist., Div. Four. May 12, 1982.]

GEORGIA-PACIFIC CORPORATION, Plaintiff and Appellant, v. CALIFORNIA COASTAL COMMISSION, Defendant and Appellant.

COUNSEL

Paul R. Haerle, Joseph A. Darrell, Steven L. Hock and Thelen, Marrin, Johnson & Bridges for Plaintiff and Appellant.

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, Dennis Eagan and Kathleen W. Mikkelson, Deputy Attorneys General, for Defendant and Appellant.

OPINION

RATTIGAN, J.—Respondent and appellant Georgia-Pacific Corporation (Georgia-Pacific) operates a lumber processing facility on real property owned by it and located on the coastline at Fort Bragg in Mendocino County. The property is within the coastal zone established by the California Coastal Act of 1976 (hereinafter Coastal Act). (Pub. Resources Code, div. 20, commencing with § 30000.)[1] Pursuant to the Coastal Act, Georgia-Pacific applied to the California Coastal Commission, North Coast Region (Regional Commission), for permits authorizing the construction of four proposed facilities on the property. After administrative proceedings to be described, appellant and respondent California Coastal Commission (Commission) granted each of the requested permits on condition that Georgia-Pacific dedicate specified easements on its property which would provide public access to the shoreline.

Georgia-Pacific thereupon commenced the present action by petitioning the superior court for a writ of administrative mandamus requiring

---

[1]Except where indicated otherwise, statutory citations in this opinion are to sections of the Public Resources Code appearing in the Coastal Act.

the Commission to issue the four permits without the access conditions. The Commission answered the petition, and the action was submitted on the record of the administrative proceedings. The trial court filed findings of fact and conclusions of law and entered a judgment ordering the issuance of a peremptory writ of mandamus as prayed.

The Commission appeals from the judgment. Georgia-Pacific appeals from it in respects described later in this opinion.

BACKGROUND

The following recitals are supported by the lengthy records made in the administrative proceedings and in the action:

The property owned by Georgia-Pacific is located along the coastline on the north and south sides of Noyo Bay, which is a wide estuary at the mouth of the Noyo River. All or most of the property is within the territorial limits of the City of Fort Bragg. It commences at Pudding Creek on the north and runs south along approximately three and one-half miles of shoreline. It is bounded on the west by the ocean, to which its land levels drop sharply down to narrow beaches from the top of a sheer bluff. The property is bounded on the east by State Highway One, which runs in a north-south direction roughly parallel to the shoreline. The part of the property north of Noyo Bay is traversed by Elm Street, a narrow way which runs west from Highway One to the ocean. The shoreline of the property at the westerly end of Elm Street is known as Glass Beach.

The property has been treated as consisting of three parcels for purposes of this action. The northernmost parcel lies between Pudding Creek and Elm Street, and is wholly undeveloped. In the findings of fact, the trial court called it "the area north of Elm Street" and accurately described it as "bounded ... by the Pacific Ocean on the west, by Pudding Creek on the north, by Highway One on the east, and by Elm Street on the south."

Georgia-Pacific conducts its lumber processing operations on the second parcel, which lies between Elm Street and Noyo Bay and the Noyo River. The trial court called this parcel the "industrial area," and described it as "bounded ... by the Pacific Ocean on the west, Elm Street on the north, Highway One on the east, and Noyo Bay and the Noyo River on the south." The court also found, and it is not disputed, that

the parcel "is subject to intensive industrial use, including heavy machinery, lumber mills and related facilities, log decks, drying stacks and an air strip."

The third parcel consists of 18 acres of undeveloped and unused land on a promontory immediately south of Noyo Bay. The trial court called it the "Noyo Headlands parcel," and described it as "located south of the industrial area and . . . geographically separated from the industrial area by Noyo Harbor and Noyo Bay." The Noyo Headlands parcel is actually "separated" from the industrial area by overwater distances of one-third of a mile at the widest point of the bay and by the width of the Noyo River at its mouth on the inland side of the bay. The only overland connection between the two parcels is by way of Highway One, which crosses the river on a bridge located upstream from the bay.

Elm Street, which divides the two parcels north of Noyo Bay, is part of an easement which Georgia-Pacific's predecessor in interest granted to the City of Fort Bragg for access to a dump site included in the grant. The grant also included a provision to the effect that the easement could be exchanged for another dump site and access route in the event of "major industrial expansion" by Georgia-Pacific. Elm Street thus represents a nonpermanent municipal easement for dumping purposes, and it is not a public street in the conventional sense.

Georgia-Pacific presently allows the public to use Elm Street for pedestrian access to Glass Beach. On weekends only, it also allows the public to use a haul road on its property for vehicular access to the shoreline near Pudding Creek. There is public access to the shoreline at Pudding Creek itself; at two points between two and three miles further north; at a small beach which is publicly owned and located on Noyo Bay at the southerly end of the industrial area; and at a third point three and one-half miles south of the property.

### THE ADMINISTRATIVE PROCEEDINGS

In and before 1978, Georgia-Pacific decided to undertake four construction projects within the industrial area only. The projects were (1) the erection of a six-foot chain link security fence to enclose approximately 120 acres of the area; (2) the construction of a helicopter pad, hangar, and related service facilities near Highway One; (3) the construction of a "forest information center," parking lot, septic system, and related facilities near the highway and south of the helicopter pad;

and (4) the construction of a "rock revetment" to replace a dike which had previously been constructed on the shoreline of the industrial area. The dike had sustained storm damage, and its replacement was necessary to prevent the contamination of ocean waters by "spillage" from a "settling pond" maintained by Georgia-Pacific in the vicinity.

In April of 1978, Georgia-Pacific applied to the Regional Commission for permits authorizing the four construction projects pursuant to section 30600 of the Coastal Act.[2] The staff of the Regional Commission recommended that the permits be issued upon condition that provisions for public access to the shoreline be required pursuant to sections 30607 and 30212.[3] The Regional Commission rejected the recommendation and granted the requested permits without requiring provisions for access.

Third parties appealed the Regional Commission's decision to the Commission. Later in 1978, after hearings, the Commission adopted findings and granted each of the requested permits on the express condition that Georgia-Pacific make "an irrevocable offer of dedication" of a number of easements across its property to provide public access to

---

[2]Section 30600, subdivision (a), provides in pertinent part that "any person wishing to perform or undertake any development in the coastal zone . . . shall obtain a coastal development permit." Georgia-Pacific applied to the Regional Commission pursuant to section 30601.

[3]Section 30607, an omnibus provision authorizing the imposition of conditions on permits issued by the Regional Commission or the Commission, appears in chapter 7 of the Coastal Act (Development Controls, commencing with § 30600). It provides: "Any permit that is issued or any development or action approved on appeal, pursuant to this chapter, shall be subject to reasonable terms and conditions in order to ensure that such development or action will be in accordance with the provisions of this division [i.e., of the Coastal Act]."

Section 30212 provided in 1978 as follows: "30212. Public access from the nearest public roadway to the shoreline and along the coast shall be provided in new development projects except where (1) it is inconsistent with public safety, military security needs, or the protection of fragile coastal resources, (2) adequate access exists nearby, or (3) agriculture would be adversely affected. Dedicated accessway shall not be required to be opened to public use until a public agency or private association agrees to accept responsibility for maintenance and liability of [*sic*] the accessway.

"Nothing in this division shall restrict public access nor shall it excuse the performance of duties and responsibilities of public agencies which are required by Section 66478.1 to 66478.14, inclusive, of the Government Code and by Section 2 of Article XV of the California Constitution."

This language appeared in section 30212 when it was first enacted as part of the Coastal Act in 1976. (See Stats. 1976, ch. 1330, § 1, p. 5958.) As will appear, the section was amended in 1979 to exclude specified facilities from definition as "new development." (See fn. 14, *post*.)

the shoreline.[4] Georgia-Pacific challenged the validity of the so-called "access conditions" by commencing the present action.

## THE ACTION

The issues raised on the appeals require that the record of the action be summarized in close detail and chronologically. It supports the recitals separately captioned below.

### The Pleadings

Georgia-Pacific filed a "Petition For Writ of Mandate" on October 13, 1978. The Commission and fictitious parties were named in the petition as the respondents in the action. Georgia-Pacific alleged in a prefatory sentence that it was seeking "a writ of mandate" directed to the Commission pursuant to Code of Civil Procedure section 1094.5. It thereupon stated 19 causes of action for this relief in separate counts.

The allegations made in the several counts of the petition may not feasibly be summarized in detail. In each count, Georgia-Pacific alleged the substance of the administrative proceedings described above and that it was entitled to relief in administrative mandamus on one or another of the grounds specified in Code of Civil Procedure section 1094.5.[5] As pertinent to the appeals, it thus alleged in some counts that

---

[4]Each of these "access easements" was either "lateral" (meaning roughly parallel to the shoreline) or "vertical" (roughly perpendicular to it). The access conditions in each of the four permits required the dedication of (1) a lateral access easement on the area north of Elm Street, seaward of the edge of the bluff and up to 25 feet inland from it; (2) a vertical access easement along Elm Street, to and from Glass Beach; (3) a lateral access easement on the Noyo Headlands parcel, seaward and up to 25 feet landward of the edge of the bluff fronting on the ocean and on Noyo Bay; (4) two vertical access easements on the Noyo Headlands parcel, running to and from the lateral easement just described; and (5) a "conditional lateral access easement" on the industrial area, again seaward of the edge of the bluff and up to 25 feet inland from it.

With regard to the "conditional lateral access easement" on the industrial area, each permit further provided: "This easement shall not be opened in whole or in part for access by the public until the applicant [Georgia-Pacific] discontinues or substantially alters the present land use in such a way as to make public use of all or part of this easement consistent with public safety."

[5]Code of Civil Procedure section 1094.5 provides in pertinent part that the review it requires "shall extend to the questions whether the respondent [administrative agency] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (*Id.*, subd. (b).) It further provides that "[a]buse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

the Commission had "failed to proceed in the manner required by law" in various respects; in others, that the Commission had "exceeded its jurisdiction and abused its discretion"; in still others, that the Commission had denied Georgia-Pacific "a fair hearing" and that certain findings the Commission had made were not supported by the evidence received in the administrative proceedings. (See fn. 5, *ante.*)

In the prayer of the petition, Georgia-Pacific requested the issuance of alternative and peremptory writs of mandate directing the Commission to set aside the permits and to reinstate the permits issued by the Regional Commission.

When the petition was filed on October 13, 1978, the trial court ordered the issuance of an alternative writ of mandate as prayed. On April 23, 1979, the Commission filed an answer to the petition in which it admitted most of the factual allegations made in each of Georgia-Pacific's several counts; denied the accompanying allegations that it was entitled to relief in administrative mandamus; and alleged several affirmative defenses.

### Further Proceedings

The first of several hearings in the action was conducted on April 25, 1979. The administrative record and excerpts from the Commission's minutes were received in evidence. After a lengthy discussion, the court ordered the cause continued and granted the parties leave to file additional points and authorities. In a memorandum and exhibit filed on June 20, 1979, Georgia-Pacific informed the court that it had abandoned the proposed "forest information center" project.[6]

Another hearing was conducted on July 9, 1979. The court announced at its conclusion that a peremptory writ of mandate would be issued as prayed.

Findings of fact and conclusions of law requested by the Commission were signed and filed on December 11, 1979. They included a number

---

[6]The memorandum included a copy of a letter from Georgia-Pacific to its attorneys dated May 17, 1979, in which it stated that "we have no further interest in a permit for the forest information center" because, "due to escalating costs, this project has been dropped . . . ." Citing these facts in the memorandum, Georgia-Pacific requested "that all issues related to the forest information center be withdrawn from consideration by . . . [the trial] . . . Court on the ground that the issues raised by the permit for the forest information center are moot." It was also stated in the memorandum that Georgia-Pacific "still desires a determination of issues related to permits for the revetment, the fence, and the helicopter pad."

of detailed determinations that various findings by the Commission were not supported by the evidence received in the administrative proceedings; a finding and a conclusion of law that the projects proposed by Georgia-Pacific were not "new development projects" within the meaning of section 30212 of the Coastal Act (see fn. 12, *post*); and a qualified conclusion of law (No. 7) to the effect that the imposition of the access conditions in all four permits had amounted to an unconstitutional taking of Georgia-Pacific's property and a "prejudicial abuse of discretion" within the meaning of Code of Civil Procedure section 1094.5, subdivision (b).[7]

A judgment granting the relief prayed by Georgia-Pacific was entered on December 13, 1979.[8] A "Peremptory Writ Of Mandamus" consistent with the dispositive provisions of the judgment was issued on December 18, 1979.

Commencing on December 28, 1979, the Commission moved for a new trial on the stated ground that the judgment was "contrary to law"

---

[7]Conclusion of law No. 7 reads: "7. Applying both the substantial evidence test and the independent judgment test, the Court concludes that the public access conditions imposed by the Commission on each of the four permits issued to Georgia-Pacific violate Article 1, Section 19 of the California Constitution and the Fifth and Fourteenth Amendments to the United States Constitution, because the conditions deprive Georgia-Pacific of private property without due process of law and without just compensation, in that the scope and extent of the easements required to be dedicated by said conditions are not reasonably related to the nature and impact of the four projects proposed by Georgia-Pacific. By imposing said conditions, the Commission committed a prejudicial abuse of discretion by failing to proceed in the manner required by law within the meaning of § 1094.5 of the Code of Civil Procedure. This Court makes no findings or conclusions as to what scope and extent of easements might be reasonably related to the four projects proposed by Georgia-Pacific. In the event that such a determination becomes necessary, the matter should be remanded to the Commission for further proceedings. Without prejudging the issue, and depending on the evidence presented to the Commission on such a remand, the Court believes that a vertical easement along Elm Street allowing public access to Glass Beach should be considered by the Commission."

[8]The dispositive provisions of the judgment read as follows:

"IT IS ORDERED, ADJUDGED AND DECREED:

"1. That a peremptory writ of mandamus issue commanding respondent [Commission] to issue to petitioner Georgia-Pacific Corporation permits for the four projects ... in the form previously issued, but without any conditions whatsoever requiring petitioner to dedicate any land, easements, or other rights of public access to or along the coast of petitioner's property;

"2. That the peremptory writ provide in the alternative that, in the event this Court's Judgment is appealed, and in the further event that the appellate courts determine that Georgia-Pacific's proposed activities are new development projects within the meaning of the [California] Coastal Act of 1976, the matter be remanded to the Commission for further proceedings in accordance with this Court's Findings of Fact and Conclusions of law ...."

because·it was "based on an erroneous interpretation of the term 'new development' as that term is used in Public Resources Code section 30212." In support of this ground, the Commission cited a 1979 enactment in which the Legislature had amended section 30212 effective January 1, 1980. (Stats. 1979, ch. 919, § 2, p. 3177; see fn. 14, *post.*) The motion for a new trial was denied on February 8, 1980.

On February 26, 1980, the Commission filed a timely notice of appeal from the judgment. In March 1980, Georgia-Pacific filed a timely "Notice Of Cross-Appeal" from the judgment in specified respects.[9]

REVIEW

*The Commission's Appeal*

I

Each of the four permits issued to Georgia-Pacific included a so-called "expiration condition" which read as follows: "A. Standard Conditions.... [¶] 3. Expiration. If construction has not commenced, this permit will expire two (2) years from the date on which the Commission voted on the application. Application for extension of this permit must be made *prior* to the expiration date." (Italics in the original.)

■ The trial court found in effect, and it is not disputed, that the Commission finally voted on Georgia-Pacific's application on September 5, 1978. The expiration conditions therefore established that the permits would expire on September 5, 1980, if Georgia-Pacific had not applied for an extension or commenced the authorized construction prior to that date. The Commission showed during the pendency of these appeals, and it is not disputed, that neither event had occurred as of mid-February, 1981. The Commission consequently contends in effect that the appeals are moot, and that they should be dismissed on that ground as to some issues, but that this court should decide at least one issue which is characterized as "a matter of great public interest."

Georgia-Pacific agrees that the issues are moot, as to the access conditions imposed on the permit for the proposed forest information

---

[9]Georgia-Pacific stated in its notice that it thereby appealed (1) "from that part of the Judgment ..." ordering the "alternative" provision in the peremptory writ of mandamus (i.e., from dispositive paragraph No. 2 of the judgment; see fn. 8, *ante*) and (2) "from said Judgment to the extent that it reflects the trial court's failure to issue the Peremptory Writ on the other and alternative grounds alleged and urged by ... Georgia-Pacific in the trial court."

center, because that facility has been abandoned as a project and will not be constructed. (See fn. 6, *ante.*) Georgia-Pacific nevertheless contends that the identical issues which remain are not moot, for the reason (among others) that the two-year term imposed by the expiration conditions was "tolled by the pendency of [the] judicial proceedings challenging the permit conditions."

No authority is cited for the argument just quoted, but it appears that *the appeal by the Commission* has had the "tolling" effect claimed. Code of Civil Procedure section 1094.5, pursuant to which the action was commenced and maintained, provides in its subdivision (h) (3) that an appeal from a judgment "granting" relief in administrative mandamus *stays* "the order or decision of the ... agency" under review, "pending the determination of the appeal," unless the appellate court otherwise orders.[10]

The "order or decision of the ... agency" under review here consists of the conditional permits issued by the Commission in 1978. The two-year lifetime established by the expiration condition in each permit had not expired when the judgment ordering issuance of the peremptory writ was entered on December 13, 1979, nor when the Commission appealed from the judgment by filing its notice of appeal on February 26, 1980. The appeal having been "taken from the granting of the writ" (as the statute puts it), it "stayed" the conditional permits "pending the determination of the appeal" because this court has not ordered otherwise. (Code Civ. Proc., § 1094.5, subd. (h) (3), quoted in fn. 10, *ante.*) The stay went into effect when the Commission took its appeal on February 26, 1980, which was before any of the permits had expired pursuant to the expiration conditions. The stay consequently reached the conditions themselves, and arrested (i.e., "tolled") their operation. Because this means that the permits have not expired at all, no issues raised on the appeals are moot except as they pertain to the permit issued for the construction of the now-abandoned forest information center.

---

[10]The statute provides in pertinent part: "1094.5. ... [¶] (h) ... [¶] (3) If an appeal is taken from a *denial* of the writ, the order or decision of the ... agency shall not be stayed except upon the order of the court to which such appeal is taken .... If an appeal is taken from the *granting of the writ*, the order or decision of the ... agency is *stayed pending the determination of the appeal* unless the court to which such appeal is taken shall otherwise order. ..." (Italics added.)

## II

■ The Commission alleged as one of its affirmative defenses that Georgia-Pacific had "waived its right to object to certain of the [access] conditions . . . by failing to object to them" at one of the administrative hearings. The trial court made an explicit finding of fact to the contrary with reference to a public hearing the Commission had conducted on August 16, 1978. The Commission contends that the court erred in "not ruling" in its favor on the waiver defense. The contention is ineptly stated, but it amounts to a challenge of the finding.

At the hearing conducted in the action on April 25, 1979, counsel for the Commission orally stipulated that "[w]e will waive our right to claim that . . . [Georgia-Pacific] . . . waived their right to object" to the access conditions. Moments later at the same hearing, counsel entered an indistinguishable oral stipulation in terms suggested by the trial court. These stipulations operated as a waiver by the Commission of the waiver defense itself. The court's finding on the defense is also supported by the administrative record. No error appears.

■ The Commission similarly alleged as an affirmative defense that Georgia-Pacific had "waived its right to object to the conditions . . . by accepting the benefits of subsequent coastal permits granted to it by the . . . Regional Commission, which did not impose additional access requirements by reason of the access conditions" exacted by the Commission. The trial court did not make a finding on this defense, but it excluded evidence of the "subsequent permits" which the Commission offered at one of the hearings below. The Commission claims error, citing the rule that a landowner or his successor in interest is barred from challenging a permit if he acquiesces in it by agreeing to it, or by failing to challenge its validity, or by accepting its benefits. (See, e.g., *County of Imperial* v. *McDougal* (1977) 19 Cal.3d 505, 510-511 [138 Cal.Rptr. 472, 564 P.2d 14].)

Georgia-Pacific challenged the validity of the access conditions by bringing this action, which it commenced shortly after the permits were issued by the Commission. The trial court sustained Georgia-Pacific's objection to the evidence of the so-called "subsequent permits" on the ground that it was "irrelevant" because it was unaccompanied by any administrative record showing the contrary. The Commission did not make or perfect an offer of proof establishing whether or how the "subsequent permits" were pertinent to the affirmative defense of acquie-

scence by Georgia-Pacific. The exclusionary ruling was therefore correct. (See Evid. Code, § 210; see also *id.*, § 354, subd. (a).) The Commission has shown no basis for application of the rule of acquiescence it now cites.

## III

■ The Commission complains of another ruling in which the trial court excluded evidence to the effect that during the administrative proceedings Georgia-Pacific had offered to dedicate certain access easements if its applications for the permits were granted. The court excluded this evidence, stating that "I find from the factual situation" that Georgia-Pacific had offered "nothing more than a compromise, attempted compromise of litigation," and ruling that the evidence was consequently inadmissible pursuant to Evidence Code section 1152.[11] The Commission claims error on the principal grounds that Evidence Code section 1152 did not apply by reason of its express terms (see fn. 11, *ante*) and the fact that "there was not even a lawsuit in existence at the time" the offers were made by Georgia-Pacific.

The trial court's finding that the offers were made in "attempted compromise of litigation" is supported by the evidence of them in the administrative record. The relevance of an offer of compromise, as an "admission by conduct," is overridden by the "public policy in favor of settlement of disputes" which underlies Evidence Code section 1152. (Witkin, Cal. Evidence (2d ed. 1966) § 378, pp. 336-337; see Cal. Law Revision Com. com. to Evid. Code, § 1152, 29B West's Ann. Evid. Code (1966 ed.) p. 25.) The policy applied here even if the precise language of the statute did not, and its application was not affected by the fact that litigation was not pending when the offers were made by Georgia-Pacific. (See Cal. Law Revision Com. com. to Evid. Code, § 1152, *op. cit. supra.*) The exclusionary ruling challenged here was correct.

## IV

The trial court made a finding of fact (No. 35) to the effect, and explicitly stated in a conclusion of law (No. 3), that the projects proposed

[11]This statute provides in pertinent part: "1152. (a) Evidence that a person has, in compromise ... offered ... money or any other thing, act, or service to another who has sustained or will sustain or claims that he has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his liability for the loss or damage or any part of it."

by Georgia-Pacific were not "new development projects" within the meaning of section 30212 of the Coastal Act.[12] The Commission claims error in these determinations, which raise several points involving the interpretation of the term "new development projects" as it is used in the statute. The points are enumerated and discussed below.

### (1)

In a memorandum filed before the hearing conducted on July 9, 1979, the Commission asked the trial court to take judicial notice of an attached copy of written "guidelines" it had recently adopted under the title "Statewide Interpretive Guidelines [¶] Public Access (Shoreline)." The "guidelines" included passages indicating the Commission's interpretation of section 30212 in various respects. Georgia-Pacific objected to the request for judicial notice at the July 9 hearing, and the court declined it, on the ground (among others) that the "guidelines" were irrelevant because they had not been "in evidence" during the administrative proceedings under review. The Commission claims error in this ruling.

The Commission correctly points out that "great weight" should be given to the construction of a statute by public agencies charged with its administration and enforcement. (See *City of Los Angeles* v. *Public Utilities Com.* (1975) 15 Cal.3d 680, 696 [125 Cal.Rptr. 779, 542 P.2d 1371]; *Standard Oil Co.* v. *Feldstein* (1980) 105 Cal.App.3d 590, 602, fn. 15 [164 Cal.Rptr. 403].) However, the Commission represented in its memorandum to the trial court that its "guidelines" had been adopted on June 21, 1979, which was several months after it had granted the conditional permits to Georgia-Pacific in 1978. The court was accordingly correct in determining that they were not relevant in its review of the Commission's actions, because they were not in existence when the actions were taken. (See Evid. Code, §§ 210, 350.) Having made this determination, we need not consider whether the ruling was correct on

---

[12]Finding No. 35 reads: "In light of the whole administrative record, there is no evidence that Georgia-Pacific's four proposed projects, either individually or collectively, constitute new development projects within the meaning of the . . . Coastal Act."

Conclusion of law No. 3 reads: "Applying both the substantial evidence test and the independent judgment test, the Court concludes that the four projects proposed by Georgia-Pacific, individually and collectively, are not 'new development projects' within the meaning and intendment of § 30212 of the Public Resources Code."

It may be mentioned here that the court stated in another conclusion of law as follows: "1. To the extent any of the findings of fact . . . are more properly considered conclusions of law, those findings are hereby incorporated in these conclusions of law."

any other ground. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 227, pp. 4216-4217.)

(2)

■ The Coastal Act comprehensively defines the term "development" for its purposes (§ 30106),[13] but in 1978 it did not include definitions of "new," or "project," or any combination of these three words. The Commission argued below that controlling definitions were to be found in Government Code sections 65928 and 65931. It now contends that the trial court erroneously "ignored" these statutes in interpreting the term "new development projects" as it is used in section 30212 of the Coastal Act.

Government Code section 65928 defines "development project" as "any project undertaken for the purpose of development...." Government Code section 65931 defines "project" as "any activity involving the issuance ... of a ... permit ... or other entitlement for use by one or more public agencies." However, both sections are in the Planning and Zoning Law (Gov. Code, tit. 7, commencing with § 65000), where they appear in chapter 4.5 (Review And Approval Of Development Projects, commencing with § 65920) under article 2 (Definitions, commencing with § 65925).

Chapter 4.5 was added to the Planning and Zoning Law in 1977. (Stats. 1977, ch. 1200, § 1, p. 3993.) It includes provisions to the effect

[13]Section 30106 appears in chapter 2 (Definitions) of the Coastal Act. Chapter 2 commences with section 30100, which provides in pertinent part that "the definitions in this chapter govern the interpretation of this division [i.e., of the Coastal Act]." Section 30106 provides in full as follows: "30106. 'Development' means, on land, in or under water, the *placement or erection of any* solid material or *structure*; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water, or of access thereto; *construction, reconstruction*, demolition, or alteration of the size *of any structure*, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations which are in accordance with a timber harvesting plan submitted pursuant to the provisions of the Z'berg-Nejedly Forest Practice Act of 1973 (commencing with Section 4511).

"As used in this section, *'structure' includes*, but is not limited to, *any building*, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line." (Italics added.)

that its purpose is "to ensure clear understanding of the specific requirements which must be met in connection with the approval of development projects and to expedite decisions on such projects" by "all public agencies." (See Gov. Code, §§ 65921, 65920.) Article 2 of the chapter also includes a definition of the term "development" which was obviously adapted from section 30106 of the Coastal Act (see Gov. Code, § 65927; compare fn. 13, *ante*), but the article commences with a provision that "the definitions in this article govern the construction" of chapter 4.5 only. (Gov. Code, § 65925.) The definitions appearing in Government Code sections 65928 and 65931 were thus enacted in a legislative context which isolates them to its own construction, and to its express legislative purposes, and does not reach the Coastal Act. They accordingly do not assist the requisite interpretation of the term "new development project" as it is used in section 30212. The trial court correctly "ignored" them.

### (3)

■ As the Commission showed on its motion for a new trial in December, 1979, the Legislature amended section 30212 in that year to provide that specified activities were *not* "new development" for purposes of the section.[14] The 1979 amendment took effect on January 1, 1980, after the judgment presently under review had been entered on December 13, 1979. In a case involving a governmental permit, however, a reviewing court must apply the law in effect when the case is decided and not when the permit was issued or denied. (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 125-126 [109 Cal. Rptr. 799, 514 P.2d 111]; *McMillan* v. *American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 181, fn. 16 [131 Cal.Rptr. 462].) We are accordingly to apply the current version of section 30212 on this review.

---

[14] The 1978 Legislature had amended the second paragraph of section 30212 (see fn. 3, *ante*) in respects not pertinent here. (Stats. 1978, ch. 1075, § 6, p. 3297.) In 1979, the Legislature reorganized the section by designating its original paragraphs as subdivisions (a) and (c), respectively, and by adding a new subdivision (b). (Stats. 1979, ch. 919, § 2, p. 3177.) On and after January 1, 1980, the amended statute read in pertinent part as follows: "30212. (a) Public access from the nearest public roadway to the shoreline and along the coast shall be provided in new development projects except where (1) it is inconsistent with public safety, military security needs, or the protection of fragile coastal resources, (2) adequate access exists nearby, or (3) agriculture would be adversely affected. Dedicated accessway shall not be required to be opened to public use until a public agency or private association agrees to accept responsibility for maintenance and liability of [*sic*] the accessway.

"(b) For purposes of this section, 'new development' does not include:

"(1) Replacement of any structure pursuant to the provisions of subdivision (g) of Section 30610.

## V

■ Subject to the foregoing conclusions controlling our interpretation of section 30212, we return to the trial court's finding No. 35 and conclusion of law No. 3. (See fn. 12, *ante.*) As the court expressly stated in the conclusion of law, the determination made in it was based on application of "both the substantial evidence test and the independent judgment test." (See *ibid.*) Georgia-Pacific did not have a fundamental vested right to develop property in the coastal zone without a permit issued pursuant to the Coastal Act. (*Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 791-799 [132 Cal. Rptr. 386, 553 P.2d 546], cert. den., 429 U.S. 1083 [51 L.Ed.2d 529, 97 S.Ct. 1089]; *Davis* v. *California Coastal Zone Conservation Com.* (1976) 57 Cal.App.3d 700, 708 [129 Cal.Rptr. 417].) The appropriate standard of review by the trial court was therefore the substantial evidence test. (Cf. *Harlow* v. *Carleson* (1976) 16 Cal.3d 731, 735 [129 Cal.Rptr. 298, 548 P.2d 698]; *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29].) This court is to apply the same test on the appeals: i.e., we "must review the whole administrative record to determine whether the agency's determination was supported by substantial evidence." (*Patter-*

---

"(2) The demolition and reconstruction of a single-family residence . . . .

"(3) Improvements to any structure which do not change the intensity of its use, which do not increase either the floor area, height, or bulk of the former structure by more than 10 percent, which do not block or impede public access, and which do not result in a seaward encroachment by the structure.

"(4) Any repair or maintenance activity for which the commission has determined, pursuant to Section 30610, that a coastal development permit will be required unless the regional commission or the commission determines that such activity will have an adverse impact on lateral public access along the beach.

"As used in this subdivision, 'bulk' means total interior cubic volume as measured from the exterior surface of the structure."

Section 30610, which is cited twice in section 30212 as amended, provides in pertinent part as follows:

"30610. Notwithstanding any provision in this division [i.e., in the Coastal Act] to the contrary, no coastal development permit shall be required . . . for the following types of development . . . :

"

"(g) The replacement of any structure, other than a public works facility, destroyed in a natural disaster. Such replacement structure shall . . . be for the same use as the destroyed structure, shall not exceed either the floor area, height, or bulk of the destroyed structure by more than 10 percent, and shall be sited in the same location on the affected property as the destroyed structure.

"As used in this subdivision, 'natural disaster' means any situation in which the force or forces which destroyed the structure to be replaced were beyond the control of its owner.

"As used in this subdivision, 'bulk' means total interior cubic volume as measured from the exterior surface of the structure."

*son* v. *Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 842 [130 Cal.Rptr. 169].)

We have pointed out that the Coastal Act defines "development" in section 30106, but that it does not define "new" or "project" as such (see fn. 13 and the accompanying text, *ante*), and that section 30212 currently defines "new development" in exclusionary terms only. (See fn. 14.) The proposed helicopter facilities and security fence meet the definition of "development," in section 30106, because each involves the "erection" of a "structure" on "land," or the "construction" of a "structure," or both. (See fn. 13.) Lacking a statutory definition of the words "new" or "project" for purposes of the Coastal Act, we resort to the "usual, ordinary, and common sense meaning" of each. (See *In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789]; *Hamilton* v. *State Bd. of Education* (1981) 117 Cal.App.3d 132, 141 [172 Cal.Rptr. 748].) The proposed helicopter facilities and fence were "new," and the construction of each was a "project," within the usual meanings of those words. Neither project was reached by the exclusionary definitions of "new development" in the present language of section 30212, subdivision (b). We conclude that both were "new development projects" within the meaning of section 30212. The trial court's finding No. 35 and conclusion of law No. 3 were incorrect as to both.

The same considerations apply to the proposed revetment project, except that evidence in the administrative record would support opposing inferences as to whether the storm-damaged structure to be replaced had been "destroyed in a natural disaster" within the meaning of section 30610, subdivision (g). (See fn. 14, *ante.*) The answer to that question would determine whether the revetment project was "new development" within the meaning of section 30212, subdivision (b)(1). (See *ibid.*) The 1979 amendment not having taken effect until January 1, 1980, neither the Commission nor the trial court made a finding which would provide the answer. The question may remain open because our identification of the helicopter facilities and the fence as "new development projects" means that sections 30607 and 30212 authorized access conditions in the permits authorizing their construction. (See fns. 3 and 14.) We turn to the conditions imposed.

## VI

We commence with the trial court's determinations in its conclusion of law No. 7 to the effects (1) that the access conditions im-

posed on each of the permits had unconstitutionally deprived Georgia-Pacific of its property "without due process of law and without just compensation, in that the scope and extent of the easements required . . . are not reasonably related to the nature and impact" of the projects proposed and (2) that in imposing the conditions the Commission had accordingly "committed a prejudicial abuse of discretion by failing to proceed in the manner required by law" within the meaning of Code of Civil Procedure section 1094.5. (See fn. 7, *ante.*)

A regulatory body may constitutionally require a dedication of property in the interests of the general welfare as a condition of permitting land development. It does not act in eminent domain when it does this, and the validity of the dedication requirement is not dependent on a factual showing that the development has created the need for it. (*Associated Home Builders, etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633, 638-640 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847]; *Frisco Land & Mining Co.* v. *State of California* (1977) 74 Cal.App.3d 736, 753 [141 Cal.Rptr. 820], cert. den. 436 U.S. 918 [56 L.Ed.2d 758, 98 S.Ct. 2263].) The "scope and extent" of the easements required by the Commission were "reasonably related" to one of the principal objectives of the Coastal Act, which is to provide for maximum access to the coast by all the people of this State. (See § 30001.5, subd. (c).) Their relationship to the "nature and impact" of the proposed projects was not a valid basis for the trial court's determination that the access conditions deprived Georgia-Pacific of its constitutional rights. The determination was erroneous.

The "scope and extent" of the required easements are factors to be considered in determining whether the Commission failed to proceed "in the manner required by law" when it exacted their dedication as conditions of the permits granted to Georgia-Pacific. The extent of the vertical access easement required along Elm Street coincides with the extent of the route presently used by the public for access to the coastline with Georgia-Pacific's permission. Its combination with the narrow lateral access easement required north of Elm Street is consistent with the Commission's statutory duty to provide for public access "to the shoreline and along the coast" in connection with a "new development project." (§ 30212, subd. (a).) The Commission proceeded "in the manner required by law" when it included dedication of the combination among the access conditions imposed in the permits. Georgia-Pacific is not entitled to relief in administrative mandamus with regard to these easements.

We reach a different conclusion as to the "conditional lateral access easement" required in the industrial area of Georgia-Pacific's property. The requirement that this easement be dedicated was the result of an express "finding" by the Commission that Georgia-Pacific "*might* at some future time change its use of the land in such a way as to remove this conflict with the blufftop trail south of Elm Street, such as by discontinuing use of the [airstrip] runway, removing the lumber from the bluff edge, or *perhaps* vacating the site entirely."[15] (Italics added.)

The trial court correctly determined that "no evidence" had been received in the administrative proceedings, "one way or the other," relative to the prospect—or supporting an inference that there was any prospect—that Georgia-Pacific "intended to change its use of the land in the industrial area at some future time." It is clearly inferable from the Commission's references to what Georgia-Pacific "might" do (or would "perhaps" do) that the body was speculating without evidence reasonably supporting an inference that the portended events would occur. Access conditions on the basis of such speculation could be exacted of any applicant for a coastal development permit at any place and any time. Nothing in section 30212, or elsewhere in the Coastal Act, authorizes the Commission to impose access conditions on that basis. When it required dedication of the conditional lateral access easement in the present case, it accordingly abused its discretion by failing to proceed "in the manner required by law" within the meaning of Code of Civil Procedure section 1094.5, subdivision (b). (See fn. 5, *ante.*) Georgia-Pacific is entitled to relief in administrative mandamus with regard to this easement.

We reach the same conclusion as to the vertical and lateral access easements required on the Noyo Headlands parcel as conditions of the permits. The requirement of their dedication was explained by the Commission immediately after it made the finding previously quoted relative to the conditional lateral access easement to be imposed on the industrial area. (See the text at fn. 15, *ante.*) The Commission further stated at that point that it "requires the applicant to dedicate lateral ac-

---

[15]The Commission's reference to "conflict with the blufftop trail south of Elm Street" was to the obvious "conflict" between public use of the trail and Georgia-Pacific's current use of the "runway" at its airstrip and of the "bluff edge" as a site for the storage of lumber. The word "discontinuing" appeared in the Commission's finding as "continuing," which was clearly a typographical error in the context. The trial court noted the error, which we have corrected in this quotation of the finding.

cess along the bluff edge of its Noyo Headlands parcel, in order to provide maximum feasible access as required by the Coastal Act and to compensate the public for its present inability to use the shoreline between Elm Street and Noyo Harbor [i.e., in the industrial area]." (Italics added.)

This statement may or may not have amounted to a finding by the Commission, but it does not support the access conditions requiring Georgia-Pacific to dedicate the lateral and vertical easements on the Noyo Headlands parcel. If that parcel shares a common boundary with the industrial area to the north, the line is under the substantial expanses of water which separate their land areas. They are not otherwise contiguous in any real sense, and in practical effect the Noyo Headlands parcel is entirely isolated from the rest of Georgia-Pacific's property. █ The access conditions were imposed pursuant to section 30212, which required the Commission to provide for public access to the shoreline "*in* new development projects." (Italics added.) The word "in" is subject to the provision of the Coastal Act requiring that the enactment be liberally construed. (§ 30009; see also Cal. Const., art. X, § 4.) Its ordinary meaning nevertheless requires that it be interpreted to mean that access conditions imposed in a permit for a "new development project" must bear some reasonable relationship to the site of the project.

That relationship may readily be perceived between the industrial area and the area north of Elm Street, which are physically contiguous at a common level of land. They are unseparated by any structures or geographical features, and they are otherwise indistinguishable as adjacent areas of a single site where the proposed projects will be carried out. The Noyo Headlands parcel bears no such relationship with that site. Section 30212 consequently did not authorize the Commission to require access easements on it as conditions of the permits for "new development projects" to be carried out elsewhere. Nothing in the Coastal Act authorized it to do this with the otherwise commendable intentions "to provide maximum feasible access" to the coastline or "to compensate the public for its present inability" to reach the coast elsewhere. When it required the easements on the Noyo Headlands parcel, it again abused its discretion by failing to proceed "in the manner required by law." Georgia-Pacific is entitled to relief in administrative mandamus with regard to these easements.

## VII

Other points have been raised or suggested in the Commission's briefs, which include approximately 150 pages. In light of the conclusions reached above, the additional points need not be discussed.

### Georgia-Pacific's Appeal

As indicated in its "Notice Of Cross-Appeal," Georgia-Pacific appeals (1) from the "alternative" provision in the judgment ordering a remand to the Commission in the event that this court finds that the proposed projects meet the statutory definition of "new development projects" and (2) from the entire judgment insofar as it denies relief in administrative mandamus on any other ground urged by Georgia-Pacific in the trial court. (See fn. 9, *ante.*) Despite the comprehensive scope thus suggested, we may summarily dispose of its two aspects.

The bifurcated appeal represents Georgia-Pacific's view that it is entitled to unqualified relief in administrative mandamus on any and all of the grounds alleged in its petition, and that the trial court accordingly erred in ordering the alternative provision that the matter was to be remanded to the Commission in the event of a determination by this court that the proposed projects were "new development projects" within the meaning of the Coastal Act. We first hold that our decision on the Commission's appeal defines the extent to which Georgia-Pacific is entitled to the relief prayed in its petition, and that we are not persuaded that it is entitled to relief on any ground not mentioned in that decision. For these reasons, we need not give further consideration to the second aspect of Georgia-Pacific's appeal.

We have also determined on the Commission's appeal that at least two of the proposed projects which are still planned (the helicopter and fence projects) are "new development projects" within the meaning of section 30212 of the Coastal Act, and that the question whether the revetment project meets that definition is still open. The first determination is the contingency which activates the "alternative" provision in the judgment. That provision may not be deemed self-executing, however, because the future course of this case is to be decided by this court in the exercise of its exclusive jurisdiction as a reviewing court.

We perceive no necessity for a remand to the Commission except for consideration of the unanswered factual question posed by the present

language of section 30212, subdivision (b) (1), relative to the revetment project. (See fn. 14, *ante.*) The permits to be issued to Georgia-Pacific at this time need not await resolution of the unanswered question because no permit to be issued to it may issue with any access conditions requiring Georgia-Pacific to dedicate access easements on its property at any place other than along Elm Street, and along the coastline north of Elm Street, as described in this opinion. We have thus established the law of the case as it will apply to any permit to be issued to Georgia-Pacific, now or later. The appeal by Georgia-Pacific need not be considered further.

The complicated dispositions required of this court pursuant to the foregoing, and on both appeals, are ordered below in terms of reversal of the entire judgment and remand to the trial court with directions to issue a new and different judgment and to take further and ancillary actions as directed. On the remand, the trial court will first enter a judgment directing the issuance of a peremptory writ of mandamus commanding the Commission to issue coastal development permits authorizing Georgia-Pacific to proceed with the helicopter and fence projects subject to the access conditions validated in this opinion and no others. The judgment and the writ should designate each permit and access condition by the number assigned to it by the Commission. The trial court will make an appropriate award of court costs in the judgment. The court will thereupon remand the matter of the revetment project to the Commission for further proceedings consistent with this opinion and with the law of the case as we have established it.

The judgment is reversed. The cause is remanded to the trial court with directions to enter a new and different judgment, and to conduct further proceedings, consistent with this opinion. Respondent and appellant Georgia-Pacific Corporation shall recover its costs on both appeals taken herein.

Caldecott, P. J., and Christian, J., concurred.