[No. B122889. Second Dist., Div. Three. Mar. 24, 2000.]

NEIL SILVER et al., Plaintiffs and Appellants, v.
LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION
AUTHORITY et al., Defendants and Respondents.

**COUNSEL**

Neyhart, Anderson, Freitas, Flynn & Grosboll, John L. Anderson, William J. Flynn; Lawrence Drasin & Associates and Lawrence Drasin for Plaintiffs and Appellants.

Kayla J. Gillan and Paul M. Ryan for Defendant and Respondent California Public Employees' Retirement System.

Parker, Milliken, Clark, O'Hara & Samuelian, Richard A. Clark and Rosa Linda Cruz for Defendants and Respondents Los Angeles County Metropolitan Transportation Authority and Public Transportation Services Corporation.

## OPINION

**KLEIN, P. J.**—Plaintiffs and appellants Neil Silver, James Williams, Robert Bennett, Robert Caudill, Johnny Howard, United Transportation Union General Committee of Adjustment (UTU), and Amalgamated Transit Union, Local 1277, AFL-CIO (ATU) (collectively, petitioners), appeal a judgment denying their petition for writ of mandate, which petition was directed against defendants and respondents Los Angeles County Metropolitan Transportation Authority (MTA), Public Transportation Services Corporation (PTSC), and the California Public Employees' Retirement System (PERS). (Code Civ. Proc., § 1085.)

The board of the MTA created PTSC, a governmental nonprofit public benefit corporation, and transferred a portion of its workforce to that entity. The petitioners contend PTSC is a sham corporation and is an illegal attempt to evade the MTA's obligation to cover its employees under Social Security. The trial court found PTSC was formed for a proper purpose, namely, to make PERS retirement benefits available to MTA employees, who are protected in an acquisition from any diminution in wages and benefits. (Pub. Util. Code, § 30753.) In addition, PTSC was established to provide transportation and planning services to other governmental entities. We conclude the trial court's determination was proper and affirm the judgment denying the petition.

### FACTUAL BACKGROUND

1. *History of MTA and its retirement plans.*

In 1992, the Legislature merged the Southern California Rapid Transit District (RTD) with the Los Angeles County Transportation Commission (LACTC) to form the MTA. (Pub. Util. Code, §§ 130050.2, 130051.13.)

Before that time, employees of the RTD, both union and nonunion, participated in RTD-sponsored retirement plans and in Social Security. In

contrast, the LACTC's permanent employees did not participate in Social Security. Instead, their retirement benefits were provided through PERS, with the entire cost being borne by the LACTC.[1]

From its inception, the MTA sought to provide a unified and cost-effective retirement plan for its employees. The MTA proposed opting out of the federal Social Security system and enrolling in PERS, which would provide higher benefits at a lower cost. By leaving Social Security, the MTA would receive a refund of approximately $100 million from the Internal Revenue Service (IRS) and save $25 million annually in Social Security taxes.

While it worked on establishing its employees' retirement plans, the MTA deposited into an escrow account funds equal to what would have been the employees' and employers' contributions under Social Security. The deposits were made to avoid potential penalties and interest pending clarification that under federal law, it was not mandatory for MTA employees to participate in Social Security.

In November 1993, in *United Transportation Union* v. *Los Angeles County Metropolitan Transportation Authority* (Super. Ct. L.A. County, No. BS025945) (*UTU v. MTA*), the unions sued the MTA to transfer some of the Social Security deposits from the escrow account to the IRS, in order to provide Social Security benefits for union members. The trial court (Judge O'Brien) entered a judgment directing the MTA to provide Social Security benefits to ATU and UTU members on the ground that, as of the date of his ruling, the MTA had yet to provide an acceptable alternate plan.

By mid-1996, the MTA reached an understanding, subject to the unions' approval, with PERS, the Social Security Administration (SSA), and the IRS that would have allowed all MTA employees an individual election to opt out of Social Security and enroll in PERS. However, the unions refused to allow their members to vote individually on whether to opt out of Social

---

[1]As a general matter, it is up to the states to decide which groups of public employees will receive Social Security coverage. (*Bowen v. Agencies Opposed to Soc. Sec. Entrap.* (1986) 477 U.S. 41, 45, fn. 6 [106 S.Ct. 2390, 2393, 91 L.Ed.2d 35].) By way of background, in 1935, when the Social Security Act was adopted, it excluded from coverage all employment by states and localities, primarily because of the question of the constitutionality of any general levy of the employer tax on states and localities. (*Id.,* at p. 44, fn. 4 [106 S.Ct. at p. 2392].) In 1950, Congress enacted 42 United States Code section 418 of the Social Security Act to authorize voluntary participation by states in the Social Security System. (477 U.S. at p. 45 [106 S.Ct. at p. 2393].) Under section 418(a), states could obtain coverage for their employees and employees of their political subdivisions, enrolling all or only specified coverage groups of workers. (477 U.S. at p. 45 [106 S.Ct. at p. 2393].) In 1951, California and the agency secretary entered into a section 418 agreement, extending Social Security coverage to employees of the state and its political subdivisions. (477 U.S. at p. 48 [106 S.Ct. at pp. 2394-2395].)

Security and to join PERS. As a result, the MTA was unable to enter into a contract with PERS and failed to secure a refund from the IRS for itself and its employees.

### 2. *MTA's creation of PTSC.*

Since its formation in 1993, the MTA had made PERS benefits available to the former LACTC employees through an interim agreement with PERS which enabled the MTA to continue to provide PERS benefits to the former LACTC employees who had been participants in PERS while at the LACTC, while the MTA sought to resolve the retirement benefit program for all its employees. PERS advised the MTA that the former LACTC employees would not be permitted to remain in PERS permanently unless substantially all of the MTA's workforce was also eligible to participate in PERS.

The MTA then decided to create a new entity, the PTSC, to provide uninterrupted coverage to its employees who participated in PERS as well as to provide its other employees with the opportunity to obtain PERS retirement benefits. The board of the MTA determined it was in the public interest to form the PTSC, a governmental nonprofit public benefit corporation, and the PTSC was formed on December 5, 1996. The PTSC then negotiated a contract with PERS to provide retirement benefits to its employees who were transferred to PTSC from the MTA. Those employees were given the option to elect among various retirement plans, and no MTA employee was transferred to the PTSC or required to join PERS or lose Social Security against his or her will.

### 3. *MTA's payment of Social Security contributions on behalf of its employees.*

As indicated, pending the resolution of these issues, the MTA made deposits with the IRS to avoid potential penalties and interest while awaiting clarification that under federal law, it was not mandatory for MTA employees to participate in Social Security. As to former LACTC employees (who had been participants in PERS and not Social Security), the MTA did not withhold the employee portion (6.2 percent of gross pay) from their paychecks. In December 1993, the MTA announced that the former LACTC employees would have Social Security contributions deducted from their paychecks. In response, the former LACTC employees formed an association, retained counsel and threatened to sue the MTA on the ground the terms of their employment required the employer to pay the entire cost of their retirement benefits and prohibited the employer from deducting Social Security from their paychecks.

In January 1994, the MTA board determined it was in the public interest to advance these employees' share of the protective Social Security deposits. The MTA board based its decision on a number of factors, including: preventing financial hardship to the former LACTC employees; avoiding costly and risky litigation; maintaining employee morale; retaining MTA employees; and the belief the entire amount of the protective deposits ultimately would be refunded by the IRS. In February 1997, after the transfer of MTA employees to the PTSC had been delayed, the MTA board voted to pay the employees' share of Social Security contributions also on behalf of former RTD employees who were transferring to the PTSC.

On August 10, 1997, about 2,000 MTA employees were transferred to the employ of the PTSC on a voluntary basis.

PROCEDURAL BACKGROUND

*Proceedings pursuant to Code of Civil Procedure section 1085.*[2]

1. *The operative third amended petition.*

On December 4, 1997, petitioners filed their operative third amended petition for writ of mandate, alleging, inter alia, the MTA improperly forgave loans that it made to certain employees to cover those employees' share of Social Security contributions.[3] The MTA then "grossed up" the income of these employees to cover the taxes they incurred as a result of the loan forgiveness. Petitioners argued the loan forgiveness and subsequent income "gross up" amounted to unconstitutional grants of extra compensation as well as unconstitutional gifts of public funds.

Petitioners also alleged the MTA was required by state statute to obtain Social Security coverage for its employees and that the MTA had evaded its statutory obligations by creating a sham corporation, i.e., the PTSC, in order to give the illusion of legitimacy to its withdrawal of its nonrepresented employees from Social Security. Petitioners alleged this was accomplished by the MTA's putatively transferring the nonrepresented employees, as well as employees in two bargaining units, Teamsters and transit police officers, to the PTSC.

Finally, petitioners pled the PTSC was not an independent and autonomous public agency within the meaning of Government Code sections 20056

---

[2]As discussed *post*, a writ of mandamus lies to compel performance of a legal duty imposed on governmental officials. (*Environmental Protection Information Center, Inc. v. Maxxam Corp.* (1992) 4 Cal.App.4th 1373, 1380 [6 Cal.Rptr.2d 665].)

[3]The individual petitioners were former RTD employees who became employed by the MTA, and were taxpayers of Los Angeles County.

and 20057 and thus did not qualify for participation in PERS, both on account of its alter ego status with respect to the MTA, and its status as an organizational unit of the MTA pursuant to Public Utilities Code section 130051.11.

### 2. Relief sought by petitioners.

By way of relief, petitioners sought the issuance of a writ directing the MTA to rescind its action of paying the employees' share of Social Security contributions, as well as the income tax liabilities incurred thereon, "and to take any and all steps necessary to recoup any money already expended in this regard." Petitioners also requested declaratory relief to the effect that the PTSC is a sham corporation and an organizational unit of the MTA within the meaning of Public Utilities Code section 130051.11 and not a public agency within the meaning of Government Code section 20056 et seq. Petitioners also sought an order directing PERS to cease and desist from honoring any contract for coverage under PERS of PTSC as a public agency and to refund to the MTA all contributions made by MTA/PTSC.

### 3. Hearing and trial court ruling.

On March 2, 1998, the matter came on for hearing. The trial court received documentary evidence, consisting of declarations and exhibits, as well as arguments of counsel. No other evidence was offered or received. The trial court denied the petition on the grounds set forth in its statement of decision.

The trial court ruled that due to the petitioners' failure to join as indispensable parties the persons from whom the moneys would have to be recouped, it declined to reach the issues of whether the MTA's payment of Social Security contributions on behalf of certain of its employees constituted a grant of extra compensation or a gift of public funds. (Cal. Const., art. XI, § 10; id., art. XVI, § 6.)

The trial court further found that Public Utilities Code section 30470 only requires the MTA to obtain Social Security coverage for its employees, but does not require the MTA to *compel* its employees to participate in Social Security. The trial court also held PTSC is not a sham corporation and was not formed for the purpose of circumventing the MTA's duties under Public Utilities Code section 30470. Also, PTSC was formed for the proper purpose of making PERS retirement benefits available to its employees and for other proper business purposes, including providing transportation and planning services to other governmental entities. Further, PTSC is a public agency

within the meaning of Government Code section 20057, subdivision (e), and is eligible to contract with PERS.

On March 30, 1998, the trial court entered a judgment denying, in its entirety, the third amended petition for writ of mandate.

On May 26, 1998, petitioners filed a timely notice of appeal from the judgment.[4]

## CONTENTIONS

Petitioners contend: the MTA loan forgiveness program was an unconstitutional grant of extra compensation and an improper gift of public funds, and the trial court erred in declining to reach those constitutional issues; the trial court erred in finding the PTSC is not a sham corporation; the MTA's purpose in creating PTSC was to evade the requirements of Public Utilities Code section 30470 to provide Social Security coverage for its employees; and PTSC cannot lawfully be an independent public agency because it is an organizational unit of the MTA.

## DISCUSSION

1. *Appellate review of mandamus proceeding.*

In this mandamus proceeding, petitioners challenged the validity of certain actions taken by the MTA, PTSC and PERS. As noted, a writ of mandamus lies to compel performance of a legal duty imposed on government officials. (*Environmental Protection Information Center, Inc., v. Maxxam Corp., supra,* 4 Cal.App.4th at p. 1380.) The pertinent statute, Code of Civil Procedure section 1085, states: "(a) A writ of mandate may be issued by any court, except a municipal court, to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ."[5]

The trial court's factual findings concerning the bona fides and purpose of PTSC are reviewed under the substantial evidence standard. (*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352].)

---

[4]A judgment denying a petition for writ of mandate is appealable. (*Kennedy v. South Coast Regional Com.* (1977) 68 Cal.App.3d 660, 666 [137 Cal.Rptr. 396].)

[5]In contrast, quasi-judicial acts are reviewed by administrative mandate under Code of Civil Procedure section 1094.5. (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785 [52 Cal.Rptr.2d 466].)

To the extent the case involves the interpretation of a statute, which is a question of law, we engage in a de novo review of the trial court's determination. (*Pomona Police Officers' Assn. v. City of Pomona* (1997) 58 Cal.App.4th 578, 584 [68 Cal.Rptr.2d 205].)

> 2. *The trial court acted within its discretion in finding the employees on whose behalf the MTA made Social Security contributions were indispensable parties; due to nonjoinder of indispensable parties, the trial court properly declined to reach petitioners' constitutional issues re grant of extra compensation and gift of public funds.*

The argument that petitioners had failed to join indispensable parties was raised by the MTA and PTSC in their written opposition to the petition. The trial court concurred. It declined to reach petitioner's claims that the MTA's payment of Social Security contributions for certain employees, and income taxes associated therewith, amounted to unconstitutional grants of extra compensation and gifts of public funds, because petitioners had failed to join the employees from whom recoupment would be sought, and those employees were indispensable parties. As explained, that ruling was proper.

### a. *Standard of review.*

■ We review the trial court's determination relating to indispensable parties under Code of Civil Procedure section 389, subdivision (b), for an abuse of discretion. (*County of San Joaquin v. State Water Resources Control Bd.* (1997) 54 Cal.App.4th 1144, 1149 [63 Cal.Rptr.2d 277].)[6]

Code of Civil Procedure section 389 "first sets out, in subdivision (a), a definition of persons who ought to be joined if possible (sometimes referred

---

[6]Code of Civil Procedure section 389 states: "(a) A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. [¶] (b) If a person as described in paragraph (1) or (2) of subdivision (a) cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable. The factors to be considered by the court include: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder. [¶] (c) A complaint or cross-complaint shall

to as 'necessary' parties). Then, subdivision (b) sets forth the factors to follow if such a person cannot be made a party in order to determine 'whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable.' . . . The subdivision (b) factors 'are not arranged in a hierarchical order, and no factor is determinative or necessarily more important than another.' [Citation.]" (*County of San Joaquin v. State Water Resources Control Bd., supra,* 54 Cal.App.4th at p. 1149, italics omitted.)

The language of Code of Civil Procedure section 389, subdivision (b), "refers to a determination 'in equity and good conscience.' . . . It makes no sense to grant the trial court an expressly discretionary power to balance the equities, then reject the court's evaluation out of hand and balance the equities anew." *(County of San Joaquin v. State Water Resources Control Bd., supra,* 54 Cal.App.4th at p. 1151.) Thus, "[s]ection 389, subdivision (b), leaves the [trial court] 'with substantial discretion in considering which factors to weigh and how heavily to emphasize certain considerations in deciding whether the action should go forward in the absence of someone needed for a complete adjudication of the dispute.' [Citation.]" (*Id.,* at p. 1154.)

### b. *Trial court's ruling.*

■ In declining to reach the constitutional issues raised by the petition, the trial court ruled: the parties "from whom the monies would have to be 'recouped' are indispensable parties who are not parties to this proceeding. [¶] . . . Basic principles of fairness and due process dictate that mandamus will not issue where the rights of non-parties will be injuriously affected; consequently, no constructive purpose would be served by an order declaring said payments were illegal because such an order would not be binding on the employees for whose benefit the payments were made. [¶] . . . Since such employees are not made parties to this proceeding, a declaration that such payments were illegal would be inadequate and would be prejudicial to the MTA because the MTA would then have to sue such employees in a separate proceeding to recoup the monies expended thereby causing a multiplicity of litigation with the possibility of inconsistent results. [¶] . . . At oral argument, in connection with the colloquy relating to whether employees on whose behalf such payments were made were indispensable parties,

state the names, if known to the pleader, of any persons as described in paragraph (1) or (2) of subdivision (a) who are not joined, and the reasons why they are not joined. [¶] (d) Nothing in this section affects the law applicable to class actions."

Petitioners suggested that the Court could rule in favor of Petitioners on the constitutional issues presented by Petitioners and mitigate the prejudice of such a ruling to the non-party employees by establishing an administrative system within the MTA to determine, on a case by case basis, which employees would be required to repay the [monies] paid on their behalf. The Court considered and rejected that suggestion. [¶] . . . Petitioners apparently have no interest in joining such parties because at least one of the Petitioners also would have to be joined as a party respondent."

    c.   *No abuse of discretion in trial court's ruling.*

In seeking to overturn the trial court's ruling, petitioners assert "[t]here is no reason in law or equity for the Court to forebear from determining the constitutionality of the MTA Board's action simply because an adverse finding *may* visit potential economic impact upon an employee who was the beneficiary of MTA Board's unlawful and unconstitutional actions." Petitioners also emphasize the petition does not seek a disgorgement order against employees who are not parties to this action, but rather, an order directing the MTA to pursue recoupment from said employees. The arguments are unavailing.

As the trial court observed, if it were to determine the payments were illegal gifts of public funds, the MTA might be subjected to an inconsistent judgment in a later proceeding against the MTA employees, who were not parties to this action and who would not be collaterally estopped from arguing the payments were proper. Thus, a determination in this proceeding that the payments were illegal would not achieve a complete adjudication of the dispute, and would result in a multiplicity of litigation. Under these circumstances, the trial court acted within its discretion in finding the MTA employees on whose behalf the payments were made were indispensable parties in whose absence the constitutional issues could not be adjudicated.[7]

3.   *No merit to petitioners' contention the trial court erred in denying them a trial on factual issues of bona fides and/or alter ego status of PTSC.*

As indicated, this matter was tried below on documentary evidence, consisting of declarations and exhibits, without live testimony. A footnote in the opening brief asserts: "Appellants assign error to Judge Yaffee's [*sic*]

---

[7]*Pursuant to Code of Civil Procedure section 389, subdivision (b),* the trial court's denial of the petition with respect to the extra compensation and gift of public funds claims was necessarily without prejudice.

refusal to order a trial with respect to the factual issues regarding the 'bona fides' and/or alter ego status of the PTSC." Leaving aside whether this footnote is sufficient to preserve the contention on appeal, it is meritless.

The record discloses that at the March 2, 1998 hearing on the mandamus petition, counsel for the petitioners asserted there was "a factual issue . . . whether or not the particular actions [the MTA] took fit within the acceptable range of conduct that a public employer can engage in and still be free of the [constitutional] prohibitions" against extra compensation and gifts of public funds. Petitioners' counsel then reiterated that whether the payments were justified "in settlement of a claim, which is one of the things that can be done that takes it out of a gift of public funds, I grant that, and—but those are factual issues . . . ." Thus, the only factual issues alluded to at the hearing related to the constitutionality of the payments made by the MTA on behalf of its employees.

Subsequently, after the trial court issued its statement of decision, and after it entered judgment denying the petition, petitioners sought reconsideration and a new trial. Petitioners argued the trial court had committed an error of law in that "there were serious factual issues which [should] have been determined by a trial on the merits." The trial court denied the motions, and properly so.

At the time the matter was heard on March 2, 1998, the matter was submitted on documentary evidence and arguments of counsel. At that juncture, the only factual issue raised by petitioners involved their theories that the employer payments violated the constitutional prohibitions against grants of extra compensation and gifts of public funds. However, due to the absence of indispensable parties, the trial court declined to reach the constitutional issues. Therefore, there properly was no trial on the merits with respect to the constitutional claims.

On appeal, petitioners have changed their position. Whereas below, petitioners asserted there were factual issues concerning the *constitutional* issues, petitioners now contend there should have been a full trial to determine the bona fides and/or alter ego *status* of PTSC. However, at the March 2, 1998 hearing, petitioners acquiesced in those issues being submitted on documentary evidence. Their belated contention, after receiving an adverse decision, that the trial court should have heard oral witness testimony on those issues is unavailing.

Also pertinent here is California Rules of Court, rule 323(a), which states: "Evidence received at a law and motion hearing[8] shall be by declaration and affidavit and by request for judicial notice without testimony or cross-examination, except as allowed in the court's discretion for good cause shown or as permitted by local rule. A party seeking to introduce oral evidence, . . . shall file, no later than three court days before the hearing, a written statement setting forth the nature and extent of the evidence proposed to be introduced and a reasonable time estimate for the hearing." Also, under the local rules, evidence in writ proceedings "is presented by way of declarations, deposition testimony, etc., and not by oral testimony unless the court, in its discretion, permits it." (Super. Ct. L.A. County, Local Rules, rule 9.31(h).) The absence of a duly filed request by petitioners to present oral testimony at the hearing further disposes of the contention.

4. *Trial court properly found on the documentary evidence submitted that PTSC is not a sham corporation.*

This issue presented a mixed question of fact and law for the trial court to resolve, based on the documentary evidence before it, as well as the pertinent statutes.

■ Below and on appeal, petitioners argue at length the PTSC is a sham corporation and merely the alter ego of the MTA. They point out, inter alia, that PTSC's entire 1998 budget of $140 million was for employee salaries and benefits, with the exception of legal and audit fees, $10,000 for check stock and printer and $885 for telephone service. There is no budgeted item for expenses such as rent, liability or property insurance or depreciation. All of PTSC's costs are billed to the MTA or to its other client, the Southern California Regional Rail Authority (SCRRA). According to petitioners, PTSC has no function other than to issue payroll checks and administer the MTA's noncontract employees' salaries and benefits.

The trial court disagreed. It ruled PTSC is not a sham corporation and found PTSC "is a lawfully created non-profit public benefit corporation in good standing, whose business has been conducted in accordance with its articles of incorporation and bylaws." The trial court rejected petitioners' contention the PTSC was formed to evade the MTA's duty to provide Social Security benefits. It concluded: "The PTSC was formed for the proper purpose of making PERS retirement benefits available to its employees and

---

[8]"Law and motion" includes any proceedings on application for writs of review, mandate and prohibition. (Cal. Rules of Court, rule 303(a)(2).)

for other proper business purposes, including providing transportation and planning services to other governmental entities."

The record contains substantial evidence to support the trial court's factual determination. The opposing declaration of Terry M. Matsumoto, chief financial officer of PTSC, states in relevant part: "PERS informed the MTA that the former LACTC employees would not be permitted to remain in PERS permanently unless substantially all of the MTA's workforce was also eligible to participate in PERS. [¶] . . . [T]he original agreement with the IRS, SSA, and PERS would have made PERS available to all MTA employees. Once it became clear that the ATU and UTU were going to block implementation of the original agreement, the MTA realized that it would not be able to make PERS available to substantially all its workforce. Consequently, the MTA had to find another way to make PERS available to the former LACTC employees. In addition, the MTA wanted to make PERS available to those employees who were not former LACTC employees who wished to participate in PERS because PERS was, in the MTA's and those employees' views, a superior retirement system . . . . [¶] . . . The best way to accomplish these goals was to create a new entity that could enter into a contract with PERS, and then transfer the former LACTC employees and certain other MTA employees (including union-represented security guards and transit police) to this new entity. Because substantially all of the employees of the new entity would be able to participate in PERS, the MTA believed that PERS would agree that this approach was acceptable. [¶] . . . [¶] . . . The MTA Board of Directors . . . determined that it was in the public interest to create the new entity. . . . [¶] . . . [¶] After the PTSC was created, it negotiated a contract with PERS to make PERS benefits available to the PTSC's employees."

While the trial court's factual findings are reviewed for substantial evidence, the trial court's interpretation and application of the pertinent statutes to those factual findings are a question of law, which we review de novo. The decision by the MTA to create PTSC for the purpose of making PERS benefits available to employees was proper, particularly in view of Public Utilities Code section 30753. The statute provides: "Whenever the district[9] [formerly the RTD, now the MTA] acquires existing facilities from a publicly or privately owned public utility, either in proceedings in eminent domain *or otherwise*, . . . [¶] [m]embers and beneficiaries of any pension or retirement system or other benefits established by that public utility shall

---

[9]Public Utilities Code section 130051.14 provides that any reference in any provision of law to the RTD or to the LACTC "shall be deemed to refer to the Los Angeles County Metropolitan Transportation Authority."

continue to have the rights, privileges, benefits, obligations and status with respect to such established system. *No employee of any acquired public utility shall suffer any worsening of his wages, seniority, pension, vacation or other benefits by reason of the acquisition."* (Pub. Util. Code, § 30753, italics added.)

MTA employees who originated at the LACTC were participants in PERS while employed at the predecessor entity; they were not participants in Social Security. Had those employees been forced to participate in Social Security at the MTA, they would have suffered a reduction in salary due to the OASDI (Old Age, Survivors and Disability Insurance) deduction of 6.2 percent of gross pay, as well as less generous retirement benefits than under PERS. Therefore, creation of PTSC for the purpose of preserving employee wages and benefits was proper.

Further, contrary to the petitioners' contention, PTSC does not exist merely as an extension of the MTA. Apart from the MTA, PTSC also has contracted with the SCRRA to provide professional and administrative services to it.

For these reasons, we uphold the trial court's determination the PTSC was formed for the proper purpose of making PERS retirement benefits available to its employees and for other proper business purposes, including providing transportation and planning services to other governmental entities.

5. *Public Utilities Code section 30470 does not require MTA or PTSC to compel its employees to participate in Social Security.*

■ Upon our de novo review, we find the trial court's statutory interpretation was proper.

Public Utilities Code section 30470 states: "The [MTA] shall take such steps as may be necessary to obtain coverage of its employees under Title 2 of the Federal Social Security Act, as amended, and the related provisions of the Federal Insurance Contributions Act, as amended."

Petitioners contend PTSC's putative employees are in fact employees of the MTA and therefore the MTA must require these employees to be covered by Social Security. The argument is unavailing. As discussed above, PTSC is not a sham corporation. It was created for a proper purpose; it is a discrete entity, and petitioners' attempt to characterize PTSC's employees as MTA personnel is unpersuasive.

Further, the MTA has complied with Public Utilities Code section 30470 by making Social Security benefits available to its employees. The record reflects no MTA employee was transferred to PTSC against his or her will, and no MTA employee was required to join PERS or lose Social Security coverage against his or her will. Nonetheless, petitioners construe the MTA's duty under Public Utilities Code section 30470 to obtain Social Security coverage for its employees as requiring the MTA to *compel* its employees to participate in Social Security. Petitioners assert the MTA has a legal obligation to cover its noncontract former LACTC employees (i.e., employees not covered by a collective bargaining agreement) under Social Security, and the MTA created the PTSC to evade this duty.

However, petitioners have misconstrued the scope of the duty under Public Utilities Code section 30470. Although Public Utilities Code section 30470 requires the MTA to obtain Social Security coverage for its employees, that statute cannot be read in isolation. It is a fundamental rule of statutory construction that " ' "every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." ' " (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 484 [208 Cal.Rptr. 724, 691 P.2d 272].) Thus, Public Utilities Code section 30470 must be read in conjunction with Public Utilities Code section 30753, discussed above, which entitled the former LACTC employees to maintain their existing level of wages and retirement benefits when they were shifted to the MTA. Had those employees been compelled to switch to Social Security, they would have been denied the protection of Public Utilities Code section 30753.

Accordingly, we concur in the trial court's determination that Public Utilities Code section 30470 does not go so far as to require the MTA or PTSC to compel their employees to participate in Social Security, and that there was no violation of the statute.

6. *The trial court properly found PTSC is a public agency eligible to contract with PERS.*

Government Code section 20460 states in relevant part: "Any public agency may participate in and make all or part of its employees members of this system by contract entered into between its governing body and the [Board of Administration of PERS] pursuant to this part." (See Gov. Code, § 20021.) As indicated, the trial court found PTSC is a public agency

pursuant to Government Code sections 20056 and 20057, subdivision (e), and is eligible to contract with PERS.[10]

Challenging that determination, petitioners contend PTSC cannot lawfully be an independent public agency because it is an organizational unit of the MTA pursuant to Public Utilities Code section 130051.11.[11] Petitioners argue that because PTSC is an organizational unit of the MTA, PTSC is not a separate and autonomous agency within the meaning of Government Code sections 20056 and 20057 and it therefore follows that PTSC is required to cover its employees under Social Security pursuant to Public Utilities Code section 30470.

The argument is flawed, in part because it disregards the MTA's concomitant duty to its employees under Public Utilities Code section 30753 to preserve the existing level of their wages and benefits, as discussed above.

Further, *PERS* examined whether PTSC qualifies as a public agency for participation in PERS, and it concluded PTSC meets the requirements of Government Code sections 20056 and 20057, subdivision (e). Because PERS is authorized to contract with public agencies for inclusion of their employees in the state public employees' retirement system (Gov. Code, § 20460), PERS by necessity is called upon to determine whether an entity is a public agency within the meaning of the statutory scheme. Pursuant thereto, PERS concluded that PTSC qualifies for participation. In making that determination, PERS found, inter alia: PTSC met the requirement for membership to be confined to public agencies. (Gov. Code, § 20057, subd. (e).) Further, PTSC had a sufficient degree of autonomy from the MTA because PTSC was created under California statute and had its own board of directors, which board had various powers, including: the power to select and remove all the officers of the corporation, to borrow money and incur indebtedness for the purpose of the corporation, to appoint committees, and to enter into contracts. PERS was guided, in part, by a 1973 Attorney General opinion, which determined the Ventura County Criminal Justice

[10]Government Code section 20056 states: " 'Public agency' means any city, county, district, other local authority or public body of or within this state."

Government Code section 20057 provides in relevant part: " 'Public agency' also includes the following: [¶] . . . . [¶] (e) Any nonprofit corporation whose membership is confined to public agencies as defined in Section 20056."

[11]Public Utilities Code section 130051.11 provides in relevant part: "(a) The Los Angeles County Metropolitan Transportation Authority may determine its organizational structure, which may include, but is not limited to, the establishment of departments, divisions, subsidiary units, or similar entities. Any department, division, subsidiary unit, or similar entity established by the authority shall be referred to in this chapter as an 'organizational unit.' "

Planning Board lacked the independence necessary to qualify as a public agency for purposes of contracting with PERS. (56 Ops.Cal.Atty.Gen. 250, 251 (1973).)

Although the interpretation of a statute is ultimately a question of law for the court (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031]), a certain deference to PERS's interpretation is appropriate. PERS possesses expertise in interpreting the statutory scheme within its administrative jurisdiction, and the criteria used by PERS are of long-standing duration. (*Id.*, at pp. 11-13.)

For all these reasons, we conclude the trial court properly held PTSC is a public agency entitled to contract with PERS.

7. *Petitioners' collateral estoppel argument meritless.*

Petitioners contend the MTA cannot relitigate the interpretation of Public Utilities Code section 30470 because that issue was resolved by the 1993 judgment in *UTU v. MTA*. The contention is meritless.

A prior determination will be given collateral estoppel effect when (1) the issue is identical to that decided in a former proceeding; (2) the issue was actually litigated and (3) necessarily decided; (4) the doctrine is asserted against a party to the former action or one who was in privity with such a party; and (5) the former decision is final and was made on the merits. (*Kelly v. Vons Companies, Inc.* (1998) 67 Cal.App.4th 1329, 1339 [79 Cal.Rptr.2d 763].) No aspect of what was decided in the previous proceeding can be left to conjecture. (*Bronco Wine Co. v. Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699, 709 [262 Cal.Rptr. 899].) " 'If, on the face of the record, anything is left to conjecture as to what was necessarily involved and decided, there is no estoppel . . . .' [Citations.]" (*Casad v. Qualls* (1977) 70 Cal.App.3d 921, 927 [139 Cal.Rptr. 243].)

In *UTU v. MTA*, the trial court (Judge O'Brien) entered a judgment directing the MTA "to take such steps as may be necessary to obtain coverage of employees of the MTA . . . under Title 2 of the Social Security Act . . . ." The minute order, which was entered the same day as the judgment, explains: "[the MTA] had committed to providing an alternative plan to Social Security. Inferentially, [the MTA] committed to Social Security if the alternative plan was not provided. [The MTA] has failed to provide an alternative plan. The use of 'may' in Public [Utilities] Code

section 30405[12] is simply a recognition of certain powers that the board has. It does not indicate that the board has absolute discretion whether to provide Social Security or not. *The board has inferentially agreed with petitioners to provide either Social Security or an acceptable alternative and they let 7 1/2 months go by without the alternative plan; therefore, plaintiffs are entitled to the only other available plan, [i.e.,] Social Security."* (Italics added.)

Thus, in *UTU v. MTA*, the court merely held that because the MTA had not yet provided an acceptable alternative retirement plan, the MTA was required to provide the plaintiffs with Social Security. That judgment did not foreclose the subsequent creation of PTSC to make PERS coverage available to employees thereof.

8. *Petitioners' request for attorney fees denied.*

Petitioners contend that should the judgment be reversed, they are entitled to an award of attorney fees pursuant to Code of Civil Procedure section 1021.5, the private attorney general statute. Because petitioners have not prevailed, the request for attorney fees likewise fails.

DISPOSITION

The judgment is affirmed. Respondents to recover costs on appeal.

Kitching, J., and Aldrich, J., concurred.

---

12Public Utilities Code section 30405 states: "The [RTD/MTA] board *may* also contract with the Board of Administration of the State Employees' Retirement System for participation in the Federal Social Security Act and *may* perform all acts necessary or convenient for such participation." (Italics added.)

The MTA board also was authorized to establish its own retirement system (Pub. Util. Code, § 30400), or in the alternative, to provide a retirement system for its employees by entering into a contract with the Board of Administration of PERS. (Pub. Util. Code, § 30404.)