[No. B187666. Second Dist., Div. Three. May 25, 2007.]

LT-WR, L.L.C., Plaintiff and Appellant, v.
CALIFORNIA COASTAL COMMISSION et al., Defendants and
Appellants.

COUNSEL

Gaines & Stacey, Fred Gaines, Lisa A. Weinberg and Noelle V. Bensussen for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, J. Matthew Rodriquez, Assistant Attorney General, John A. Saurenman and Rosana Miramontes, Deputy Attorneys General, for Defendants and Appellants.

OPINION

**KLEIN, P. J.**—Plaintiff and appellant LT-WR, L.L.C., a Nevada limited liability company (LT-WR), appeals a judgment denying in part its petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) and dismissing its complaint. LT-WR's petition sought to overturn a decision by defendants California Coastal Commission (Commission) and its Executive Director, Peter M. Douglas, denying LT-WR's application for a coastal development permit (CDP).

The Commission cross-appeals a portion of the trial court's judgment, insofar as the judgment directs the Commission to vacate its denial of LT-WR's application for a permit to maintain gates and no trespassing signs on its property.

In the final portion of this opinion relating to the cross-appeal, we conclude the trial court properly overturned the Commission's denial of a permit for the gates and no trespassing signs. Inherent in one's ownership of real property is the right to exclude uninvited visitors. In prohibiting LT-WR from excluding the public from its property on the theory that "potential exists to establish prescriptive rights for public use," the Commission in effect decreed the existence of such rights. We find the Commission's denial of a permit for the gates and signs, premised on the existence of "potential" prescriptive rights, was speculative and properly was overturned by the trial court.

The judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

The subject real property is a 23-acre parcel commonly known as 1953 Latigo Canyon Road located in the Santa Monica Mountains in unincorporated Malibu atop Castro Peak (the property). The property is partially

developed with communications towers and communications antennae. LT-WR leases a discrete area on Castro Peak for an "antenna farm."

Situated on the property is a mobilehome for a caretaker, John Burroughs, who has resided there since the early 1970's and who provides 24-hour maintenance and security services essential to the ongoing operations of the antenna facilities.

The property was acquired by LT-WR's predecessor in interest, SoCal Communications (SoCal), which transferred it to LT-WR in 2002.

### 1. *Previous permit actions.*

In 2001, the Commission conditionally approved coastal permit No. 4-00-222 for SoCal for the relocation of a preexisting unpermitted 120-foot high communications tower and the construction of a 150-foot high tower with no grading.

SoCal sued, challenging two of the permit's conditions. The parties settled the lawsuit in June 2002. The settlement agreement, inter alia, required SoCal to file a complete permit application for the caretaker's mobilehome on the property within 30 days of the settlement agreement, and provided the Commission would waive local approvals in the event SoCal filed a complete permit application for the residential trailer.

### 2. *New permit application for preexisting and new development.*

On July 15, 2002, LT-WR, SoCal's successor, submitted application No. 4-02-175 seeking an after-the-fact approval of the following *unpermitted* development: the mobilehome; a storage trailer; two metal gates with fence sections on either side across Newton Canyon Motorway where the roadway intersects the property line at the east and west edges of the project site; and "*no trespassing*" signs on the gates.

LT-WR also sought approval for *new* development consisting of a new septic system to serve the mobilehome, a water well, improvement of an existing road that would require 700 cubic yards of grading, and the construction of a new road segment along LT-WR's northern property boundary parallel to the existing road.

In addition, LT-WR proposed to relocate the unpermitted mobilehome and storage trailer to a different location on the same building pad area, and to relocate an unpermitted horse stable from an adjacent site owned by the

National Park Service (NPS) to an upper area of LT-WR's property. LT-WR indicated it would remove certain preexisting unpermitted development that was not included in the project's description. In addition, there were unpermitted structures, trailers, a water tank, equipment and materials on the property that LT-WR did not include as part of its permit application.

Commission staff corresponded with LT-WR's agent over a period of several months in an attempt to obtain a complete permit application. On August 13, 2002, staff sent a letter informing LT-WR the application was incomplete. The letter indicated that pursuant to the settlement agreement, the Commission had agreed to waive local approvals only for the mobilehome and not for other unpermitted development.

On October 3, 2002, LT-WR's agent submitted some of the items staff had requested but refused to submit local approvals for the unpermitted development, citing the settlement agreement's provision waiving local approvals for the caretaker's residence.

On November 7, 2002, staff sent another letter informing LT-WR the permit application remained incomplete. The missing items included: project drawings including site plans; copies of geologic and soils reports; preliminary fire department approval for all driveways, access roads and turn-around areas; a detailed biological study of the project site; and clarification of the project description.

LT-WR did not respond to the November 7, 2002 notice of incompletion until May 2, 2003, at which time it submitted additional materials. At that time, LT-WR also reiterated its position that the Commission had waived local approvals pursuant to the terms of the settlement agreement.

Although various items had not been submitted as of May 2, 2003, and LT-WR acknowledged that certain items were still pending, LT-WR sent letters to the Commission on July 17, 2003, August 18, 2003, and October 17, 2003, asserting that because the Commission had not responded within 30 days of the May 2, 2003 submission, the application was deemed complete for processing under the Permit Streamlining Act (Gov. Code, §§ 65920 et seq., 65943).

Staff did not respond to these letters because the incomplete file had not been reassigned after the staff person assigned to the subject application departed on leave.

On November 30, 2003, an agent for LT-WR provided public notice under the Permit Streamlining Act that its application would be deemed approved 60 days from the date of the notice if the Commission failed to act on the application before the 60-day period expired. (Gov. Code, § 65956, subd. (b).)

Despite the fact the permit application remained incomplete, the Commission scheduled a January 14, 2004 hearing on the application to preclude LT-WR from claiming the project was deemed approved.

In processing the application, staff reviewed historic aerial photographs of the property to determine what development existed on the site before January 1, 1977, the effective date of the California Coastal Act of 1976 (the Coastal Act) (Pub. Resources Code, § 30000 et seq.). Staff compared the earlier photographs to those taken in 2001. Staff determined that since 1977, grading and vegetation removal had occurred without the required coastal development permits.

At its January 14, 2004 meeting, the Commission unanimously voted to deny the permit application. The Commission found, inter alia, the proposed project was inconsistent with the Coastal Act's requirements regarding environmentally sensitive habitat areas (ESHA's), water quality, visual resources and community character and recreation. The Commission also noted the existence of feasible alternatives to the project that would not result in significant adverse impacts and would be consistent with the policies of the Coastal Act.

### 3. *Trial court proceedings.*

On March 12, 2004, LT-WR filed a verified petition for writ of mandate and complaint for damages. The first cause of action, which is the crux of this case, sought a petition for writ of mandate to set aside the Commission's decision denying LT-WR's permit application. The second cause of action asserted LT-WR had a vested right to maintain and use the caretaker's residence without a CDP, and that the Commission's denial of LT-WR's application amounted to a violation of LT-WR's vested rights. The third, fourth, fifth and sixth causes of action, respectively, pled a taking of property without just compensation, deprivation of civil rights by the Commission's executive director, and violations of due process and equal protection.

Pursuant to stipulation, the trial court stayed the nonwrit causes of action (i.e., the second through sixth causes of action), pending a determination of the petition for writ of mandate.

On April 11, 2005, the matter came on for hearing. Without objection, the trial court admitted the administrative record into evidence. The trial court considered the evidence, heard the arguments of counsel and took the matter under submission.

On August 5, 2005, the trial court issued a statement of decision denying LT-WR's petition for writ of mandate and upholding the Commission's decision, except for that portion of the Commission's decision denying LT-WR's permit application for the two gates and the "no trespassing" signs. With respect to the gates and signs, the trial court ruled in favor of LT-WR. The trial court held the gates and signs were not "development" within the meaning of the Coastal Act (Pub. Resources Code, § 30106) and that LT-WR was entitled to protect its private property and to minimize trespassing by maintaining the gates and signs. The trial court noted that in denying the application with respect to the gates and signs, the Commission had found "there are 'potential' public prescriptive rights." In overturning that aspect of the Commission's decision, the trial court ruled "[a]lthough the Commission has extensive powers to protect coastal areas, it has not been given the authority to declare/designate public easements on private property."

On the second cause of action, the trial court ruled against LT-WR, rejecting its assertion of vested rights in the mobilehome because LT-WR failed to exhaust its administrative remedies.

In the statement of decision, the trial court also directed the parties to file briefs regarding whether the remaining causes of action were moot. Following supplemental briefing, the trial court ruled those causes of action were moot and should be dismissed.

On September 27, 2005, the trial court entered judgment granting in part and denying in part LT-WR's petition for writ of mandate and dismissing the other causes of action. The trial court directed issuance of a writ of mandate commanding the Commission to vacate its denial of LT-WR's permit application with regard to the gates and signs on the subject property.

LT-WR's appeal and the Commission's cross-appeal followed.

## CONTENTIONS

LT-WR contends: the trial court applied the incorrect standard of review; LT-WR has a fundamental vested right to maintain and continue to use the caretaker's residence; the Commission exceeded its jurisdiction in denying

LT-WR's permit application; the Commission lacked jurisdiction to deny the application because it violated the 49-day rule; the Commission lacked authority to look beyond the approved land use to designate ESHA; the Commission's findings are not supported by substantial evidence in the record; and the third through sixth causes of action were not mooted by the trial court's ruling on the petition for writ of mandate.

On cross-appeal, the Commission contends the trial court erred in exempting the gates and signs from the Coastal Act's permit requirement.

## DISCUSSION

1. *Standard of appellate review.*

As discussed below, because LT-WR failed to establish a vested right, the independent judgment test did not apply at the trial court level. The trial court properly utilized the substantial evidence test in reviewing the Commission's decision. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 218 [130 Cal.Rptr.2d 564] (*MHC*).)

Our role is identical to that of the trial court. We review the administrative record to determine whether the Commission's findings are supported by substantial evidence. (*MHC, supra,* 106 Cal.App.4th at pp. 217–220.)

However, to the extent the case involves the interpretation of a statute, which is a question of law, we engage in a de novo review of the trial court's determination. (*Silver v. Los Angeles County Metropolitan Transportation Authority* (2000) 79 Cal.App.4th 338, 348 [94 Cal.Rptr.2d 287].)

2. *No merit to LT-WR's contention it was entitled to superior court review under the independent judgment standard; in the absence of a fundamental vested right, the trial court properly utilized the deferential substantial evidence standard.*

a. *Trial court's ruling.*

The trial court addressed the issue of the appropriate standard of review in its statement of decision as follows: "In reviewing the Commission's decision, except where vested rights are involved, the Court applies the substantial evidence standard of review which requires the Court to determine, in light of the entire administrative record, whether substantial evidence supports the Commission's decision. [Citation.] Under the substantial evidence

standard, the Court may not substitute its judgment for the agency's. [Citation.] It is for the Commission, not the Court, to weigh conflicting evidence. Substantial evidence includes expert opinions, photographs, as well as observations from the Coastal Commissioners, Commission staff, members of the public and governmental officials. The findings of the administrative agency are to be accorded a strong presumption of correctness. [Citation.] It is petitioner's burden to show there is no substantial evidence to support the findings of the agency. [Citations.]"

"The Court rejects LT-WR's argument that the independent judgment standard of review should be applied here because this case does not involve LT-WR's fundamental vested rights in its unpermitted development."

 b. *LT-WR's contention.*

LT-WR contends the trial court utilized the incorrect standard of review because in reviewing a claim of vested rights, the trial court is required to utilize its independent judgment to examine the record and determine whether the weight of the evidence supports the agency's decision. (*Paoli v. California Coastal Com.* (1986) 178 Cal.App.3d 544, 550 [223 Cal.Rptr. 792] [independent judgment test applies where fundamental vested rights are involved].) Here, the trial court first decided LT-WR's vested rights were not involved and, based on that finding, determined the independent judgment standard was inapplicable. The issue of vested rights, however, was the ultimate issue to be determined by the trial court. The trial court erred in basing its decision as to the appropriate standard of review on an assumption as to the outcome of the ultimate issue. Further, the trial court's error in using the wrong standard of review was prejudicial. Had the trial court used the independent judgment standard, it would have found for LT-WR, as the weight of the evidence distinctly favored LT-WR.

As discussed below, this contention fails.

 c. *Trial court properly utilized substantial evidence standard because LT-WR's vested rights are not implicated.*

As set forth in the next part, *post*, LT-WR does not have a fundamental vested right to maintain and continue to use the caretaker's residence. Therefore, the trial court properly refused to apply its independent judgment in reviewing the Commission's decision.

3. *No merit to LT-WR's claim it has a fundamental vested right to maintain and continue to use the caretaker's residence; trial court properly ruled LT-WR waived its vested rights claim by failing to apply to the Commission for a vested rights determination.*

LT-WR contends it has a fundamental vested right to maintain and continue to use the mobilehome/caretaker's residence because the subject development existed before January 1, 1977, the effective date of the Coastal Act; there is no evidence that unpermitted removal of vegetation and grading occurred on the site after January 1977; and LT-WR was not required to exhaust the Commission's procedure for obtaining a final vested rights determination.

a. *Trial court's ruling.*

The statement of decision, in disposing of LT-WR's vested rights claim, provides in relevant part: "The Court rejects LT-WR's assertion of vested rights in the mobile home because LT-WR has not exhausted its administrative remedies. . . . [¶] *Commission regulations provide a mandatory procedure by which a landowner obtains a vested rights determination from the Commission, and LT-WR failed to utilize such procedure.* . . . LT-WR is required to utilize such procedure and obtain a final determination granting a claim of exemption to prevent or avoid the CDP application and hearing procedure and before presenting its vested rights claim to the judiciary." (Italics added.)

b. *Trial court properly ruled LT-WR failed to duly present its vested rights claim to the Commission in the first instance.*

Public Resources Code section 30608 provides: "*No person who has obtained a vested right in a development prior to the effective date of this division* or who has obtained a permit from the California Coastal Zone Conservation Commission pursuant to the California Coastal Zone Conservation Act of 1972 (former Division 18 (commencing with Section 27000)) *shall be required to secure approval for the development pursuant to this division.* However, no substantial change may be made in the development without prior approval having been obtained under this division." (Italics added.)

■ Commission regulations provide a mandatory procedure by which a property owner obtains a vested rights determination from the Commission. (Cal. Code Regs., tit. 14, § 13200 et seq.)

(1) *Overview of administrative procedure for obtaining a vested rights determination.*

"Any person *claiming a vested right* in a development and who wishes to be exempt from the permit requirements of the Act pursuant to Public Resources Code Section 30608 *must substantiate the claim in a proceeding before the Commission under this subchapter.* In such a proceeding the claimant shall assume the burden of proof." (Cal. Code Regs., tit. 14, § 13200, italics added.)[1,2]

The critical regulation for our purposes is section 13201, which states: *"Any person who claims that a development is exempt from the permit requirements of Public Resources Code, Section 30600 or 30601 by reason of a vested right under Public Resources Code, Section 30608 must file a claim of vested rights with the commission and obtain approval under this subchapter."* (Italics added.)

With respect to claim forms, the regulations provide: "Claim of vested rights forms shall be published by the commission. The executive director of the commission shall revise the form as necessary to assist claimants in providing the information necessary to substantiate a claim, provided, however, that any significant change in the type of information requested must be approved by the commission. A claim of vested rights shall be filed only after the claimant has provided the commission with all the information called for by the form, as well as any other information which the executive director of the commission deems necessary to review the claim. In no event shall a claim of vested rights be deemed filed until after the passage of five (5) working days from the date it is received by the commission." (§ 13202.)

With respect to an initial determination, the regulations provide: "As soon as practicable after the filing of a claim, and in no event later than 30 days from the filing date, the executive director of the commission shall make an initial determination whether the claim of vested rights appears to be substantiated; notice of the initial determination shall be transmitted to the

---

[1] "[T]he mere fact the concept of vested rights is rooted in the Constitution does not deprive the commission of the power to make the initial determination whether an exemption is warranted, so long as ultimate judicial review is provided." (*South Coast Regional Com. v. Gordon* (1977) 18 Cal.3d 832, 836 [135 Cal.Rptr. 781, 558 P.2d 867]; accord, *Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 63 [227 Cal.Rptr. 667, 720 P.2d 15].)

[2] Unless otherwise specified, all further section references are to the California Code of Regulations, title 14.

claimant and to any person(s) requesting notice or known by the executive director to be interested. Based on that initial determination, the executive director shall make a written recommendation to the commission for consideration at the hearing on the claim of vested rights application at the next succeeding regularly scheduled meeting. At such hearing, the executive director shall introduce into evidence all evidence submitted by the applicant and all evidence submitted either supporting or in opposition to the application up to the deadline for submission of evidence established by the commission." (§ 13203.)

Thereafter, "[n]otice of the recommendation and the date of the public hearing on the claim shall be made in the manner prescribed by Section 13059." (§ 13204.)

With respect to hearing procedures, the regulations provide: "(a) Commission action on a claim of vested rights shall be supported by written findings of fact. If the commission finds that a claim of vested rights is substantiated, it shall acknowledge the claim. If it finds that a claim is not substantiated, it shall deny the claim. However, if the circumstances suggest that a claimant may be able to provide additional information to substantiate the claim or that other evidence is pertinent to the claim, the matter may be continued for the purpose of submitting further evidence and for action at the next succeeding meeting following the receipt and review of the information. [¶] (b) Claims which the executive director recommends be acknowledged may be placed on a consent calendar and processed in the manner provided by Sections 13101 and 13103. [¶] (c) All other claims shall be processed in the manner provided by Sections 13080–13096." (§ 13205.)

A "final determination of the commission recognizing a claim of vested rights shall constitute acknowledgment that the development does not require a coastal development permit under Public Resources Code, Section 30600 or 30601 provided that no substantial change may be made in the development except in accordance with the permit requirements of the California Coastal Act of 1976. If the approvals upon which the acknowledgment is based lapse either by their own terms or pursuant to any provision of law, the acknowledgment made under this subchapter shall no longer be in effect and the development shall become subject to the permit requirements of the California Coastal Act of 1976." (§ 13207.)

> (2) *No merit to LT-WR's contention it was not required to utilize the Commission's procedure for obtaining a vested rights determination.*

LT-WR's theory is that filing a vested rights claim with the Commission, in accordance with the above procedures, is only mandatory for a property

owner claiming to be *exempt* from the permitting process and is not required for an owner, such as LT-WR, which filed an application for a coastal development permit. LT-WR emphasizes that rather than claiming to be *exempt* from the permitting process, it submitted a permit application in order to obtain a coastal development permit; in the application, LT-WR asserted it had vested rights to maintain and use the caretaker's residence and appurtenant structures in their existing locations.

■ The argument has no merit. As stated in *Davis v. California Coastal Zone Conservation Com.* (1976) 57 Cal.App.3d 700 [129 Cal.Rptr. 417] (*Davis*): "A [property owner] who claims to be exempt from the Coastal Zone Conservation Act permit requirements by reason of a vested right to develop the property must claim exemption on that basis. (Cal. Admin. Code, tit. 14, § 13700 et seq.) *Where the developer fails to seek such a determination but instead elects to apply only for a permit,* he cannot later assert the existence of a vested right to development, i.e., the developer waives his right to claim that a vested right exists. (*State of California* v. *Superior Court*[ (1974)] 12 Cal.3d 237, 248–250, 252 [115 Cal.Rptr. 497, 524 P.2d 1281].)" (*Davis, supra,* 57 Cal.App.3d at p. 708, italics added.)

LT-WR also contends that in any event, it presented its vested rights claim at the administrative level; in the process of seeking a CDP, LT-WR asserted it had a vested right to maintain and use the caretaker's structure and appurtenant structures in their existing locations. LT-WR asserts this presentation to the Commission was sufficient to meet the Coastal Act's exhaustion requirements.

This backup argument fails. LT-WR's failure to seek a vested rights determination in the first instance precluded it from later claiming entitlement to a coastal development permit based on the alleged existence of a vested right. (*Davis, supra,* 57 Cal.App.3d at p. 708.) Moreover, as set forth above, the regulations provide an elaborate administrative mechanism for the determination of a vested rights claim. LT-WR disregarded those procedures. LT-WR did not apply to the Commission for a vested rights determination pursuant to Public Resources Code section 30608 and the pertinent regulations.

■ As noted, the trial court "reject[ed] LT-WR's assertion of vested rights in the mobile home because LT-WR has not exhausted its administrative remedies." The trial court's ruling was legally correct. Under the doctrine of exhaustion of administrative remedies, a duly filed vested rights claim is a

prerequisite to pursuing judicial action against the Commission based on its denial of an alleged vested rights claim.

Due to LT-WR's failure to exhaust its administrative remedies with respect to its claim of vested rights in the mobilehome, it is unnecessary to discuss LT-WR's additional arguments with respect to the merits of its vested rights claim.

> 4. *No merit to LT-WR's contention the Commission's failure to act on its CDP application pursuant to the 49-day rule deprived the Commission of jurisdiction to deny the permit application.*

■ LT-WR contends the Commission had no jurisdiction to deny its CDP application because the Commission violated the 49-day rule (§ 13062), which requires the Commission to hold a public hearing on the application no later than the 49th day after the application is filed.

> a. *Trial court's ruling.*

In this regard, the statement of decision provides: "The Court rejects LT-WR's contention that the Commission had no jurisdiction to act on its Application under the 49-day rule set forth in Public Resources Code section 30621 (a) and Title 14 of the Code of Regulations section 13062. The 49-day rule requires the Coastal Commission to hold a public hearing on a permit application no later than 49 days after the date on which the 'application is filed' with the Commission. For purposes of the 49-day rule, a permit application is not deemed 'filed' until the Coastal Commission's executive director determines it is complete. (Cal. Code of Regs., tit. 14 § 13056(a).) The Court finds that substantial evidence in the record shows that several items were and are still outstanding and the Application was incomplete. . . . The 2002 Settlement Agreement does not waive local approvals for development other than the mobile home. Furthermore, Petitioner did not exhaust the administrative remedy available to challenge the Coastal Commission executive director's finding of incompleteness."

> b. *Pertinent statutory and regulatory provisions.*

The Coastal Act provides: "A hearing on any coastal development permit application or an appeal shall be set no later than 49 days after the date on which the application or appeal is filed with the commission." (Pub. Resources Code, § 30621, subd. (a).) Consistent therewith, section 13062 states: "The executive director of the commission shall set each application filed for

public hearing no later than the 49th day following the date on which the application is filed."

■ A permit application is filed only after the executive director reviews the application and finds that it is complete. (§ 13056, subd. (a).)

■ Under the Permit Streamlining Act (Gov. Code, § 65920 et seq.), the Commission has 30 days after receiving an application to make a determination as to whether the application is "complete." (Gov. Code, § 65943, subd. (a).) "If the written determination is not made within 30 days after receipt of the application, and the application includes a statement that it is an application for a development permit, *the application shall be deemed complete for purposes of this chapter. Upon receipt of any resubmittal of the application, a new 30-day period shall begin*, during which the public agency shall determine the completeness of the application. If the application is determined not to be complete, the agency's determination shall specify those parts of the application which are incomplete and shall indicate the manner in which they can be made complete, including a list and thorough description of the specific information needed to complete the application. The applicant shall submit materials to the public agency in response to the list and description. [¶] (b) Not later than 30 calendar days after receipt of the submitted materials, the public agency shall determine in writing whether they are complete and shall immediately transmit that determination to the applicant. If the written determination is not made within that 30-day period, *the application together with the submitted materials shall be deemed complete for purposes of this chapter.*" (Gov. Code, § 65943, subds. (a), (b), italics added.)

 c. *The Commission's failure to hold a timely public hearing did not divest it of jurisdiction to deny the application.*

On May 2, 2003, LT-WR made its final resubmittal to the Commission. This was in response to the Commission's notice of incompletion dated November 7, 2002, which requested LT-WR to submit 14 additional items. The Commission did not respond to the May 2, 2003 letter, either to request additional items or to indicate that the application was complete or incomplete.

The Commission asserts LT-WR never filed a complete permit application, despite repeated advisements from the Commission as to what additional information was needed before the application could be deemed complete. Be that as it may, under the Permit Streamlining Act, "[u]pon receipt of *any resubmittal* of the application, *a new 30-day period shall begin*, during which

the public agency shall determine the completeness of the application." (Gov. Code, § 65943, subd. (a).) Therefore, the Commission's failure to notify LT-WR within 30 days of the May 2, 2003 submittal that the application remained incomplete had the effect of the application being deemed complete by operation of law, as of June 1, 2003. (*Ibid.*) The Commission then was required to hold a public hearing on the application within 49 days, i.e., by July 20, 2003. (§ 13062; Pub. Resources Code, § 30621, subd. (a).) The public hearing did not occur until January 14, 2004.

Nonetheless, as discussed below, the Commission's noncompliance with the 49-day rule did not divest it of jurisdiction to deny LT-WR's application.

### (1) *Mandatory or directory time limit.*

■ "The word 'mandatory' may be used in a statute to refer to a duty that a governmental entity is required to perform as opposed to a power that it may, but need not exercise. As a general rule, however, a ' "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.' [Citation.] If the action is invalidated, the requirement will be termed 'mandatory.' If not, it is 'directory' only. [¶] *Time limits are usually deemed to be directory unless the Legislature clearly expresses a contrary intent.* [Citation.]" (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1145 [43 Cal.Rptr.2d 693, 899 P.2d 79], italics added.)

When the Legislature "has specified a time within which an administrative board is to render a decision, that time limit may be mandatory in the obligatory sense, but this 'does not necessarily mean that a failure to comply with its provisions causes a loss of jurisdiction.' [Citation.] [¶] . . . [¶] In construing a statute, a court may consider the consequences that would follow from a particular construction and will not readily imply an unreasonable legislative purpose. Therefore a practical construction is preferred. [Citation.]" (*California Correctional Peace Officers Assn. v. State Personnel Bd., supra,* 10 Cal.4th at p. 1147.)

### (2) *The 49-day rule is directory, not jurisdictional.*

■ The pertinent statute does not indicate a legislative intent to make the prescribed time limit jurisdictional. It states: "A hearing on any coastal development permit application or an appeal *shall* be set no later than 49

days after the date on which the application or appeal is filed with the commission." (Pub. Resources Code, § 30621, subd. (a), italics added.)

By way of comparison, Public Resources Code section 30625, pertaining to appeals to the Commission, states in relevant part: "(a) . . . The commission may approve, modify, or deny such proposed development, *and if no action is taken within the time limit specified in Sections 30621 and 30622, the decision of the local government or port governing body, as the case may be, shall become final,* unless the time limit in Section 30621 or 30622 is waived by the applicant." (Italics added.)

Had the Legislature intended, in Public Resources Code section 30621, to preclude the Commission from hearing and denying a permit application beyond the 49-day period, it certainly could have so provided.

We also consider the practical consequences of LT-WR's construction of the 49-day rule as jurisdictional. The goals of the Coastal Act are protection of the coastline and its resources and maximization of public access. (*Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1011 [73 Cal.Rptr.2d 841, 953 P.2d 1188]; *La Fe, Inc. v. County of Los Angeles* (1999) 73 Cal.App.4th 231, 235 [86 Cal.Rptr.2d 217].) A construction of the 49-day rule which permits the Commission to retain jurisdiction, and thereby render a decision, is manifestly more practical than one which cuts off the jurisdiction of the Commission and strips the Commission of its authority to deny a permit application. For these reasons, we agree with the trial court that the 49-day period is not jurisdictional.

Moreover, LT-WR was not without a remedy in the face of the Commission's delay in hearing the matter. LT-WR could have filed a petition for writ of mandate to compel the Commission to hear and decide the permit application. (*California Correctional Peace Officers Assn. v. State Personnel Bd., supra,* 10 Cal.4th at p. 1148.) LT-WR did not do so.

In sum, the Commission's failure to hold a timely public hearing did not divest it of jurisdiction to hear and deny LT-WR's application.

> 5. *No merit to LT-WR's contention the Commission improperly designated the property as an ESHA.*

> a. *The Commission's findings.*

The Commission found, inter alia, "that large contiguous, relatively pristine stands of coastal sage scrub and chaparral in the Santa Monica Mountains meet the definition of ESHA," and that with respect to the subject property,

"due to the important ecosystem roles of chaparral in the Santa Monica Mountains . . . , and the fact that the subject site below the existing developed area is relatively undisturbed and part of a large, unfragmented block of habitat, . . . the chaparral on and surrounding the project site meets the definition of ESHA [(Pub. Resources Code, § 30107.5)] under the Coastal Act."[3]

### b. *Summary of LT-WR's arguments.*

In this regard, LT-WR contends the Commission had no authority to look outside the approved land use plan (LUP) to designate ESHA; the Commission's authority to designate ESHA's expired in 1978; the approved LUP demonstrates that no ESHA exists on the property; and the evidence presented at the Commission hearing did not establish ESHA.

### c. *Trial court's ruling.*

With respect to ESHA, the statement of decision provides in relevant part:

"ESHA is established by the Land Use Plan ('LUP') certified by the Commission on December 11, 1986. The LUP is the only document or the only finding by any governmental agency as to the designation of ESHA in this general area. Policy 57 of the LUP designates ESHA as mapped on Figure 6 *and also 'any undesignated areas which are identified through the biotic review process or other means . . . .'* Although no portions of the subject properties are mapped as ESHA on Figure 6, the evidence presented at the Commission's hearing established that the unpermitted development occurred within ESHA. As noted, *the LUP provides for additional identification of ESHA in undesignated areas through 'biotic review process or other means.'*

"The Coastal Act requires the protection of ESHAs (Pub. Resources Code, § 30240), and even if the Commission no longer has authority to designate entire areas as ESHAs pursuant to [Public Resources Code] Section 30502(a), it has authority and the duty to determine in connection with specific coastal permit applications whether specific proposed projects violate the policies set forth in Chapter Three of the Coastal Act. As noted by the California Supreme Court most recently, 'The Coastal Act created the coastal commission as the entity with the primary responsibility for the implementation of

---

[3] " 'Environmentally sensitive area' means any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments." (Pub. Resources Code, § 30107.5.)

the Coastal Act (§ 30330) . . . .' [(*Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 20 [30 Cal.Rptr.3d 30, 113 P.3d 1062].)]

"The commission's finding that the chaparral on and surrounding the project site here meets the definition of ESHA under the Coastal Act (Pub. Resources Code, § 30107.5), is supported by substantial evidence. Those areas of the site within the two original firebreaks that are still devoid of chaparral vegetation are not considered ESHA because they were cleared prior to the enactment of the Coastal Act in 1940 and 1958. . . . The chaparral on the subject property meets the three tests for ESHA designation. . . . First, the slope vegetation was identified as principally chaparral. Commission staff visited the subject property on December 9, 2003, and confirmed that the project site outside of the disturbed area consists of chaparral vegetation. . . . Chaparral had been removed from the developed portion of the subject property, including the area upon which the mobile home is located. . . . Second, the subject property is located in the Solstice Canyon watershed which is relatively undisturbed and pristine. . . . The slopes on the subject property below the disturbed areas are well vegetated with chaparral vegetation. . . . Third, the slopes on the project site are part of a larger block of pristine habitat. The slopes lead to the pristine watershed cover of chaparral and riparian habitat in Solstice Canyon to the south and southeast. . . . Similarly, the chaparral on and surrounding the project site meets the definition of ESHA under the biotic review process of the LUP. . . .

"The Petitioner relies on a letter from County Supervising Planner Dr. Daryl Koutnik, which states that: 'the County of Los Angeles has designated no environmentally sensitive habitat areas (ESHA) or significant oak woodlands on the parcel in question,' . . . and the Los Angeles County Department of Regulations planning determination that 'the project will have no significant effect on the environment.' . . . That there may be a difference of opinion between Dr. Koutnik and the Commission and the Commission's expert as to ESHA on a specific property is not a sufficient basis for concluding that the Commission's decision is not supported by substantial evidence. The Commission may choose which expert to rely on, and the Court may not substitute its judgment." (Italics added.)

> d. *Statutory scheme relating to designation of sensitive coastal resource areas.*

Public Resources Code section 30502, subdivision (a), required the Commission to designate sensitive coastal resources areas by September 1, 1977. Public Resources Code section 30517 authorizes a one-year extension of that deadline. The Coastal Act provides: "Recommendation by the commission to the Legislature shall place the described area in the sensitive

coastal resource area category for no more than two years, or a shorter period if the Legislature specifically rejects the recommendation. If two years pass and a recommended area has not been designated by statute, it shall no longer be designated as a sensitive coastal resource area." (Pub. Resources Code, § 30502.5.)

> e. *In arguing the Commission lost its ability to designate ESHA's, LT-WR confuses the terms "environmentally sensitive habitat areas" and "sensitive coastal resource area."*

LT-WR's contention the Commission's authority to designate ESHA's expired in 1978 confuses the terms "environmentally sensitive habitat area" and "sensitive coastal resource area." The two terms are not interchangeable. Chapter 2 of the Coastal Act (Pub. Resources Code, § 30100 et seq.) sets forth the definitions which govern the act.

As indicated, "environmentally sensitive area" means "any area in which plant or animal life *or their habitats* are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments." (Pub. Resources Code, § 30107.5, italics added.)[4]

The term "sensitive coastal resource area" is not synonymous with "environmentally sensitive area." The act defines "sensitive coastal resource areas" as "those identifiable and geographically bounded land and water areas within the coastal zone of vital interest and sensitivity. 'Sensitive coastal resource areas' include the following: [¶] (a) Special marine and land habitat areas, wetlands, lagoons, and estuaries as mapped and designated in Part 4 of the coastal plan. [¶] (b) Areas possessing significant recreational value. [¶] (c) Highly scenic areas. [¶] (d) Archaeological sites referenced in the California Coastline and Recreation Plan or as designated by the State Historic Preservation Officer. [¶] (e) Special communities or neighborhoods which are significant visitor destination areas. [¶] (f) Areas that provide existing coastal housing or recreational opportunities for low- and moderate-income persons. [¶] (g) Areas where divisions of land could substantially impair or restrict coastal access." (Pub. Resources Code, § 30116.)

■ It was only the Commission's authority to designate "sensitive coastal resource areas" which expired in 1978. (Pub. Resources Code, §§ 30502, 30517.) The Commission did not lose its authority to protect ESHA's. To the contrary, the Commission has an ongoing duty to protect

---

[4] In view of the language of Public Resources Code section 30107.5, we reject LT-WR's contention the Coastal Act does not define an ESHA.

ESHA's. Public Resources Code section 30240 states, *without any limitation as to time*: "(a) *Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values*, and only uses dependent on those resources shall be allowed within those areas. [¶] (b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas." (Italics added.)

In sum, the Legislature provided the Commission only a brief period in which to designate *sensitive coastal resource areas*. (Pub. Resources Code, §§ 30502, 30502.5, 30517.) However, that limitation does not prevent the Commission from implementing its obligation to protect *ESHA's* pursuant to Public Resources Code section 30240.

> f. *No merit to LT-WR's contention the Commission improperly looked outside the approved County LUP to designate ESHA on the property.*

LT-WR contends whether the property contains ESHA is determined solely by the LUP approved by the county and certified by the Commission in 1986, and the record reflects that no ESHA was mapped on the property.

The 1986 LUP, at section 4.2.1, paragraph 57, states: "Designate the following areas as Environmentally Sensitive Habitat Areas (ESHAs): (a) those shown on the Sensitive Environmental Resources Map (Figure 6), *and (b) any undesignated areas which meet the criteria and which are identified through the biotic review process or other means*, including those oak woodlands and other areas identified by the Department of Fish and Game as being appropriate for ESHA designation." (Italics added.)

Therefore, under the controlling LUP, the fact the subject property was not mapped as ESHA does not preclude it from being designated as an ESHA, provided it meets the appropriate criteria for such designation.

> g. *Substantial evidence supports the Commission's designation of the property as ESHA.*

As a preliminary matter, the Commission found, based on a 2003 memo by John Dixon, Ph.D., an ecologist/wetland coordinator, that "large contiguous, relatively pristine stands of coastal sage scrub and chaparral in the Santa Monica Mountains meet the definition of ESHA." The Dixon memo indicates, inter alia, in the Santa Monica Mountains, "rare animals that inhabit coastal sage scrub include the Santa Monica shieldback katydid, silvery

legless lizard, coastal cactus wren, Bell's sparrow, San Diego desert woodrat, southern California rufous-crowned sparrow, coastal western whiptail and San Diego horned lizard." Similarly, chaparral in the Santa Monica Mountains provides habitat for various sensitive animal species, as well as sensitive plant species.

In assessing whether a specific property within the Santa Monica Mountains qualifies for ESHA designation, the Commission applies a three-part test: "First, is the habitat properly identified, for example, as coastal sage scrub or chaparral? Second, is the habitat undeveloped and otherwise relatively pristine? Third, is the habitat part of a large, contiguous block of relatively pristine native vegetation?"

Here, the Commission found the project site meets the definition of ESHA. It noted: "Commission staff visited the subject property on December 9, 2003 and confirmed that the project site outside of the disturbed area consists of chaparral vegetation." It found "[t]he slopes on the site below the graded and disturbed areas are well vegetated with chaparral vegetation. The slopes lead to the pristine watershed cover of chaparral and riparian habitat in Solstice Canyon to the south and southeast. The slopes on the project site are thus part of a larger block of pristine habitat."

We conclude the Dixon memo, coupled with the results of a staff visit to the property, constitute substantial evidence to support the Commission's ESHA determination with respect to the subject property.

6. *Substantial evidence supports the Commission's determination LT-WR's proposed development violated the Coastal Act and LUP policies.*

a. *LT-WR's contentions.*

LT-WR challenges the sufficiency of the evidence to support the Commission's determination that LT-WR's proposed development violates the Coastal Act and LUP policies concerning development within significant watersheds and wildlife movement corridors. LT-WR also challenges the sufficiency of the evidence to support the Commission's decision to deny the proposed relocation for the mobilehome, storage trailer and horse stable on the grounds it would require an additional 10,000 square feet of vegetation removal.

b. *Trial court's ruling.*

In this regard, the statement of decision provides: "Substantial evidence supports the Commission's decision to deny the after-the-fact development

consisting of the mobile home, the storage trailer, the horse stable on NPS property, the access road connecting Castro Peak Motorway to the developed portion of the site and new development consisting of a septic system, water well, 700 cu. yds. of grading to improve existing road, and the construction of a second parallel road on the northern property boundary. *The proposed development is inconsistent with Coastal Act policies and LUP policies concerning development within or adjacent to ESHA.* Significant Watersheds and Wildlife Movement Corridors requiring that: structures be clustered to minimize the effects on sensitive environmental resources; that structures be located as close to the periphery of the watershed as feasible; that structures and uses be located as close as possible to existing roadways to minimize the construction of new infrastructure; that grading and vegetation removal be limited and a graded pad be no larger than 10,000 square feet; that new on-site access roads be limited to 300 feet or one-third of the parcel depth; that the cleared area not exceed 10 % of the area excluding access roads; and that site grading shall be accomplished in accordance with the stream protection and erosion control policies. . . .

"Substantial evidence supports the Commission's decision to deny the proposed relocation of the after-the-fact mobile home, storage trailer, and horse stable on NPS property. . . . *The proposed project requires an additional 10,000 square feet of vegetation removal* beyond the already developed 80,000 square feet within the main firebreak." (Italics added.)

 c. *No merit to LT-WR's contentions in this regard.*

As a preliminary matter, LT-WR's contention "the *weight of the evidence* did not support the finding that LT-WR's development fails to comply with the County LUP policies pertaining to significant watersheds" is an irrelevancy. Our role, like that of the trial court, is to review the Commission's decision under the deferential substantial evidence test. (*MHC, supra,* 106 Cal.App.4th at pp. 217–220.)

With respect to protection of environmental resources, paragraph 65 of the 1986 county LUP states in relevant part: "Any development within a significant watershed shall be located so as to minimize vegetation clearance and consequent soil erosion, adverse impacts on wildlife resources and visual resources, and other impacts. Therefore, development should be clustered and located near existing roads, on areas of relatively gentle slopes as far as possible outside riparian areas in canyons and outsides ridgeline saddles between canyons which serve as primary wildlife corridors."

The Commission found, inter alia, "[t]he proposed caretaker's residence and storage trailer, along with an unpermitted pad (including vegetation

removal) would result in an expansion of the developed area of the site and would extend development down a steep slope further into a significant watershed. . . . The pad would be constructed on a steep slope, increasing the potential of soil into the watershed. As described above, the developed area of the site on the ridge . . . is already over 80,000 sq. ft. Given this large area of development on the site, it is especially important to cluster all structures within it. As proposed, the placement of the caretaker's residence and storage trailer would not cluster structures to minimize the effects on sensitive environmental resources. The proposed structures would not be located as close to the periphery of the watershed as feasible."

LT-WR does not challenge the sufficiency of the evidence to support these findings by the Commission with respect to the impact of the project on the watershed. Instead, it asserts the "weight of the evidence" does not support the Commission's determination that LT-WR's proposed development fails to comply with county LUP policies pertaining to significant watersheds. Because it is not our function to reweigh the evidence, we summarily reject this contention.

We also reject LT-WR's related contention the Commission erred in denying the proposed relocation for the mobilehome, storage trailer and horse stable on the grounds it would require an additional 10,000 square feet of vegetation removal. LT-WR asserts it was seeking a CDP simply to effectuate a *"de minimis"* shift in location of buildings to areas *which had previously been cleared.*

The Commission "has generally found that a development area of no more than 10,000 sq. ft., with all structures clustered within it will provide an owner an economically viable use of the property while minimizing the impacts of vegetation removal, grading, placement of impermeable surfaces, erosion, runoff, and fuel modification to the extent feasible."

With respect to LT-WR's application to place a mobilehome structure on the parcel as a caretaker's residence, the Commission noted: "The development is proposed to be located on an unpermitted pad area that was graded after the effective date of the Coastal Act (January 1, 1977). . . . [T]his area of the site has been altered without a coastal development permit since 1977. Approximately 9,360 sq. ft of chaparral vegetation was removed adjacent to the intersection of the two existing firebreaks on the site. [¶] Additionally, a pad of approximately 16,000 sq. ft and road were graded both within the existing fire-break and the area where vegetation was removed after 1977. Staff would note that the applicant is not requesting after-the-fact approval for this pad or for the vegetation removal associated with it. *Nonetheless, staff has considered the application as though the unpermitted development has*

*not already occurred.* The applicant is proposing to place the caretaker's residence and storage trailer on the pad, so the impacts of developing the pad must be considered along with those of the structures." (Italics added.)

In order to enable the Commission to protect coastal resources, and to avoid condoning unpermitted development, the Commission properly reviewed the application as though the unpermitted development had not occurred. Therefore, we reject LT-WR's contention it was merely seeking a de minimis relocation of existing structures "to areas which had previously been cleared."

7. *Substantial evidence supports the Commission's determination the development would have an adverse impact on visual resources.*

a. *The pertinent statute.*

Public Resources Code section 30251 states: "The scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas, to minimize the alteration of natural land forms, to be visually compatible with the character of surrounding areas, and, where feasible, to restore and enhance visual quality in visually degraded areas. New development in highly scenic areas such as those designated in the California Coastline Preservation and Recreation Plan prepared by the Department of Parks and Recreation and by local government shall be subordinate to the character of its setting."

b. *The Commission's determination the proposed development would have an adverse impact on visual resources.*

The Commission found: "The proposed project site is located in a highly scenic area. Castro Peak ridgeline is one of the highest and most visible landmarks in the Santa Monica Mountains. The LUP designates Castro Peak as a Significant Ridgeline. . . . [¶] . . . [¶] . . . The ridgeline is visible from a very large area, including parklands and trails. The site is visible, in particular, from the National Parks Services lands in Solstice Canyon, Malibu Creek State Park, and the Backbone Trail. [¶] . . . [¶] The grading of the pad in the proposed location on a steep slope on a highly scenic ridgeline would have individual significant adverse impacts on visual resources from public areas. Chaparral habitat was removed and an undetermined amount of grading and landform alteration was carried out for the construction of the pad. The existing access road was constructed with an undetermined amount of grading and the removal of approximately 540 sq. ft. of vegetation. Further improvements, including 700 cu. yds. of grading would be necessary to

extend the road 600 feet from the property line to the pad and improve it to the required standard as well as to pave it. Further, the cumulative impacts of the pad in conjunction with the other development on the site would have significant effects on visual resources. . . . [T]here is approximately 81,000 sq. ft. of area on the ridge, within the large firebreak, that has already been denuded of vegetation, graded, or otherwise developed. As such, there is already a large area of the site that has been altered. Finally, the placement of the caretaker's residence in the proposed location would also require the removal, irrigation and/or thinning of chaparral on a steep slope as a result of fuel modification for fire protection purposes. The areas that are subject to fuel modification, particularly in the square pattern that the applicant has proposed, will read differently (areas where all vegetation is removed will be the color of the bare dirt while areas that are thinned will be a different color) than the surrounding natural vegetation and given the prominence of the ridge will be visible from a great distance. Therefore, the proposed project will not minimize grading and landform alteration on a prominent ridgeline, and is therefore not consistent with the requirements of [Public Resources Code] Section 30251 of the Coastal Act or the visual resource policies of the [LUP]."

### c. *Trial court's ruling.*

With respect to visual resources, the statement of decision provides: "The LUP designates Castro Peak as a Significant Ridgeline, which is *highly scenic* and is one of the highest and *most visible* landmarks in the Santa Monica Mountains. Castro Peak is visible from public parklands and trails including the National Park Service lands in Solstice Canyon, Malibu Creek State Park, and the Backbone Trail. [¶] Substantial evidence supports the Commission's decision to deny the proposed development . . . because it is inconsistent with the Coastal Act and LUP visual resource policies in that the proposed development will not minimize highly visible grading and vegetation removal on a prominent ridgeline."

### d. *LT-WR's arguments relating to visual resources are meritless.*

LT-WR asserts the Commission "presented no evidence to show that the CDP, if granted, would be inconsistent with the Coastal Act and LUP visual and scenic resource policies." LT-WR attacks the Commission for beginning its analysis with the artificial premise that none of the items applied for in LT-WR's application existed, despite their having been there for decades. LT-WR contends the Commission's finding the placement of the caretaker's residence and fuel modification area would be visible from a great distance was unsupported by any photographic or scientific evidence. LT-WR asserts the property is already dominated by communication towers that are 150 to

300 feet high. Further, LT-WR attacks the Commission's reliance on aerial photographs to show the property is highly visible from trails in the Santa Monica Mountains because aerial photographs only show that the property is visible from the air, not from surrounding trails or properties.

In essence, LT-WR is asking this court to reweigh the evidence which the Commission considered. We decline to do so. The aerial photographs cited by the Commission reasonably support the inference the subject property is visible from hiking trails in the Santa Monica Mountains and that the development would have significant adverse impacts on visual resources from public viewing areas. On this record, we conclude substantial evidence supports the Commission's determination the project would have an adverse impact on visual resources.

> 8. *Substantial evidence supports the Commission's determination with respect to feasible design alternatives.*
>
> a. *The Commission's decision.*

With respect to alternatives to the project, the Commission's decision states: "There are siting and design alternatives to the proposed project which, if implemented, could be found consistent with the policies of the Coastal Act and the LUP. The proposed caretaker's residence could be resited to the center area of the site . . . . There are several potential sites where the residence could be placed within this area. . . . Resiting the caretaker's residence, with the associated changes in the project would significantly reduce impacts to ESHA. First, the amount of chaparral ESHA removed, irrigated, or otherwise altered to provide fuel modification would be significantly reduced. Additionally, the proposed portion of the road that extends to the pad could be eliminated. The grading and vegetation removal to create the pad would not be necessary. As part of this alternative, the proposed storage trailer and horse stables could be included on the upper area of the site (within the larger fire-break), assuming that these structures could be constructed of inflammable materials and would not require fuel modification. . . .

"[LT-WR's] agent has stated that resiting the proposed residence may present conflicts regarding proximity of a residential use to the telecommunications towers. As noted above, staff requested information on standards for separation between such towers and residential uses. The only information that [LT-WR's] agent provided was a letter . . . stating that local and state governments are precluded from applying regulations or restriction based on concerns related to the potential harmful health effects of possible exposure to radiofrequency radiation. While staff does not agree that [LT-WR] adequately addressed this issue, no other information was provided by [LT-WR's] agent

regarding necessary separation between the various types of uses existing and proposed on the project site. If [LT-WR] later determine[s], based on additional information, that there is a conflict between the placement of the caretaker's residence in the alternative area and the maintenance of the communications facilities, it may be necessary to either relocate the communications facilities or to eliminate the proposed residence. Other security measures could certainly be employed if necessary, such as fencing, security cameras, and security patrol. Other existing communications facilities, such as those just to the west on Castro Peak, and others on Saddlepeak do not employ personnel that live on-site.

"Other alternatives that could be employed to minimize impacts to ESHA include the construction of the proposed septic system in a different location. . . . This alternative location for the septic system would minimize impacts to chaparral ESHA by eliminating the removal of vegetation on the steep slope to run lines down to seepage pits in Newton Canyon Motorway.

"Finally, there is an alternative to the proposed second parallel roadway along the northern property line. . . . [A]n available alternative to constructing a second, parallel roadway would be [to] utilize the existing roadway. This alternative would eliminate the proposed grading and removal of chaparral vegetation. Therefore, the Commission finds that there are feasible alternative to the proposed project that would not result in significant adverse effects on the environment and would be consistent with . . . the Coastal Act."

### b. *Trial court's ruling.*

The trial court found "there are feasible siting and design alternatives to the proposed project that would not result in significant adverse effects on the environment and would be consistent with the Coastal Act and LUP policies, i.e., clustering development within the already developed 80,000 square feet and using the existing road. There are several alternative sites in the center area of site, north of the proposed location where the mobile home, septic system, water well, storage trailer, and horse stables could be relocated."

### c. *No merit to LT-WR's contentions in this regard.*

LT-WR contends the relocation of caretaker's residence and appurtenant structures to the alternative sites suggested by the Commission would be infeasible because the county fire department has already approved the fuel modification plan for the proposed project. The argument is patently without merit. The mere fact that fire officials have approved a brush clearance plan in connection with a particular proposal does not make pursuit of an alternative proposal infeasible.

LT-WR also contends the suggested relocation of the caretaker's residence to a site beneath the telecommunications towers is infeasible because such a move is within the exclusive jurisdiction of the Federal Communications Commission.

However, as the Commission noted in its decision, its staff requested information from LT-WR regarding standards for separation between such towers and residential uses, and the only information that LT-WR provided was a letter discussing federal preemption of local and state regulations relating to the potential harmful health effects of exposure to radiofrequency radiation. Thus, LT-WR did not adequately address this issue with the Commission.

Curiously, LT-WR contends the Commission's design alternatives are infeasible, but at the same time, it faults the Commission for denying the CDP application without giving LT-WR an opportunity to implement the suggested alternatives. Thus, LT-WR implicitly concedes the design alternatives are in fact feasible.

LT-WR also asserts that rather than denying the application, the Commission should have approved the application, subject to appropriate conditions of approval. However, the Commission is not required to redesign an applicant's project to make it acceptable. (*Bel Mar Estates v. California Coastal Com.* (1981) 115 Cal.App.3d 936, 942 [171 Cal.Rptr. 773].) The denial of the instant proposal does not bar LT-WR from submitting a new and different proposal. (*Ibid.*) All that is involved here is an administrative decision, supported by the record, denying the application which LT-WR submitted.

9. *Trial court properly dismissed the third through sixth causes of action.*

a. *Third cause of action: the taking claim is not ripe for decision.*

In the third cause of action, LT-WR alleged the Commission's denial of its permit application resulted in a taking of its property without just compensation and was an undue interference with LT-WR's reasonable investment-backed expectations upon which LT-WR acted in acquiring the property. The trial court, after largely upholding the Commission's decision, dismissed the taking claim as moot.

As the Attorney General recognizes in its brief, the defect in the third cause of action is not mootness but lack of ripeness. The question

whether property has been taken is not ripe for decision until a government agency has rendered a final decision on the use to which the property in question may be put. (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 325 [82 Cal.Rptr.2d 649].) As noted, LT-WR already has established a commercial use, i.e., leasing space for telecommunications facilities, on the site. Further, the Commission's decision had identified feasible alternatives to the project, but LT-WR has not sought a permit for those alternatives. Until such time as a final decision has been made by the responsible regulatory body, invested with great discretion, as to what development will be permitted on a particular plot of land, a taking claim is not ripe for adjudication. (*Id.* at pp. 325, 331–332.)

In the absence of a ripe taking claim, the trial court properly dismissed LT-WR's third cause of action.[5]

 b. *Trial court properly dismissed due process, equal protection and civil rights claims as moot.*

In the fourth cause of action, LT-WR alleged the Commission's executive director, by improperly directing staff to recommend denial of the application, deprived LT-WR of its civil rights. The fifth cause of action alleged the Commission's conduct in denying LT-WR's application violated LT-WR's substantive and procedural due process rights under both the federal and state Constitutions. Finally, the sixth cause of action alleged the Commission's conduct in denying LT-WR's application lacked a rational basis and violated LT-WR's equal protection rights under the state and federal Constitutions. The trial court dismissed these claims as moot. We uphold the trial court's ruling in this regard.

LT-WR has not shown any procedural or substantive defect in the proceedings, other than the Commission's error of law in denying a permit for the gates and signs, as discussed in the next part. In our review, we affirm the judgment of the trial court, which upheld the Commission's decision in its entirety except for the Commission's denial of a permit with respect to the gates and signs. However, even as to the Commission's denial of a permit for the gates and signs, the gates and signs have remained in place and LT-WR has never lost the use thereof. The determination the Commission acted properly, coupled with the continued presence of the gates and signs, moots LT-WR's claims that the Commission's conduct violated its constitutional and civil rights.

---

[5] Regardless of the trial court's rationale, because the dismissal of the taking claim is correct in result, it must be upheld. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

10. *The Commission's cross-appeal is without merit; the trial court properly overturned the Commission's denial of a permit for the gates and no trespassing signs on the property.*

By way of background, the two gates with fence sections are 39 feet and 31 feet wide and were installed without coastal development permits. Attached to the fences were "no trespassing" signs.

The Commission's decision refused to grant an after-the-fact approval for the construction of two gates with fence sections on either side across Newton Canyon Motorway where the roadway intersects the property line at the east and at the west edge of the project site. In this limited respect, the trial court overturned the Commission's decision and directed the Commission to vacate its denial of a CDP with regard to the gates and signs. We uphold the trial court's ruling, although not on the same grounds as the trial court.

a. *Trial court's ruling.*

In addressing this issue, the statement of decision provides: "The Commission based its denial of the two gates and signs on alleged noncompliance 'with [Public Resources Code] Section[s] 30210, 30212[(a)], 30251, 30252(3), and 30253(5) of the Coastal Act, which mandate the maximum public access and recreational opportunities be provided, that new development be visually compatible with the character of the surrounding area, and that special communities that are popular visitor destination points be protected.' The Commission also denied the gates and signs by finding that there are 'potential' public prescriptive rights, that the gates are not 'necessary', and that the gates and signs are akin to a 'gated community.'

*"The Court finds that the two metal gates and signs are not 'development' under Public Resources Code section 30106.*[6]

■■■ "Section 30106 describes 'development' as the placement or erection of any solid material or structure on land. 'Structure' includes, but is not limited to, pipe, conduit, telephone, electrical power transmission and distribution lines. The items described as 'structures' are involved in, utilized for, and support development of a project. Gates, on the other hand, are intended to protect private property and decrease risk of exposure to tort liability by minimizing trespassing by uninvited strangers.

---

[6] The issue of whether the fences/gates and signs are development is significant because development in the coastal zone requires a CDP. (Pub. Resources Code, § 30600.)

"It is undisputed that the two gates are on a portion of Newton Canyon Motorway which traverses [LT-WR's] property. While numerous people state the property has been used for years for riding, hiking, motorcycling, picnicking and they feel they have a right to use it, there is no evidence in the record of a public easement having been adjudicated over [LT-WR's] private property. Although the Commission has extensive powers to protect coastal areas, it has not been given the authority to declare/designate public easements on private property.

"The record discloses huge acreage of public recreational lands in the area owned by the Federal and State authorities. In fact, [LT-WR's] property is surrounded on three sides by parkland. Thus, the public has a vast opportunity to partake of the beauty of nature in the area without the necessity to utilize private property. The gates and signs even if they inhibit some people from traversing [LT-WR's] property do not inhibit maximum public access to and recreational opportunities on public lands in violation of the Coastal Act.

"Even if the gates are 'development,' substantial evidence does not support the findings that they are inconsistent with the visual resource policies and character of the surrounding area.

"The gates are typical and not unlike other gates in the vicinity. Neither the simple, rustic physical look of the two gates, nor their existence, remotely resemble the gates or create the appearance of gated communities, and are not akin to 'gated community.' They are compatible with the surrounding area. The gates are no larger than necessary to span the motorway and do not alter the rural, open, and scenic community, character of the area." (Italics added.)

> b. *Trial court erred as a matter of law in ruling the gates and signs are not "development" within the meaning of the Coastal Act.*

To the extent this matter involves the interpretation of a statute, which is a question of law, we engage in a de novo review of the trial court's determination. (*Silver v. Los Angeles County Metropolitan Transportation Authority* (2000) 79 Cal.App.4th 338, 348 [94 Cal.Rptr.2d 287].)

The pertinent statute, Public Resources Code section 30106, provides in relevant part: " '*Development*' *means, on land,* in or under water, *the placement or erection of any solid material or structure . . . .* [¶] *As used in this section, 'structure' includes, but is not limited to,* any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line." (Italics added.)

Notwithstanding the statutory definition, the trial court reasoned that gates and signs are not "development" because they were merely "intended to

protect private property and decrease risk of exposure to tort liability by minimizing trespassing by uninvited strangers." However, irrespective of the intent behind the installation of the gates and signs, that has no bearing on whether the gates and signs are "development" within the meaning of the statute.

■ The gates/fences, with attached signs, clearly fall within the act's definition of "development." (Pub. Resources Code, § 30106.) Development includes "any solid material or structure." (*Ibid.*) The statute's definition of "structure" as including, but "not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line" (*ibid.*), is not an exhaustive listing and cannot be interpreted to mean that gates and fences are not structures or development by virtue of their function on a property.

Further, case law supports the conclusion that the gates and attached signs constitute development. *Georgia-Pacific Corp. v. California Coastal Com.* (1982) 132 Cal.App.3d 678 [183 Cal.Rptr. 395], held a security fence met the definition of "development" in Public Resources Code section 30106 because it "involve[d] the 'erection' of a 'structure' on 'land,' or the 'construction' of a 'structure,' or both." (132 Cal.App.3d at p. 698.)

Therefore, the trial court erred as a matter of law in ruling the gates and signs are not "development" within the meaning of Public Resources Code section 30106. We conclude the gates and signs are "development" within the meaning of the statute so as to require a development permit, but that on this record, the Commission erred in denying a permit therefor.

> c. *Even though the gates and signs are "development," the Commission erred in denying a permit therefor; in the absence of a judicial determination that prescriptive rights exist for public use of Newton Canyon Motorway, the Commission's denial of a permit for gates and signs on the ground that potential prescriptive rights exist was speculative.*

The Commission did not deny a permit on the ground the gates would have an adverse environmental impact in terms of movement of wildlife or otherwise. Rather, the Commission based its decision on the existence of *potential* prescriptive rights in favor of the public. The Commission found "[e]vidence exists . . . of public use of Newton Canyon Motorway for hiking and equestrian use, including *potential* prescriptive rights, which would be affected by the proposed development." (Italics added.) Based on letters

submitted "describing historic use, the Commission [found] that *potential exists to establish prescriptive rights for public use of this road.*" (Italics added.) The Commission further found "[t]he area surrounding the subject site . . . is rural in nature ·. . . . *The proposed gate will convey to visitors the message: keep out, visitors are not welcome.* This impact is inconsistent with the fact that the site is located within the [Santa Monica Mountains National Recreational Area], an area devoted to providing visitors with recreational opportunities and protecting natural habitats. . . . [T]erritorial reinforcement, such as a security gate, defines public and private spaces, and 'serves as a warning and deters entry by an offender.' " (Italics added.)

 Inherent in one's ownership of real property is the right to exclude uninvited visitors. (See Black's Law Dict. (5th ed. 1979) p. 1095 [definition of property]; *General Dynamics Corp. v. County of L. A.* (1958) 51 Cal.2d 59, 71 [330 P.2d 794] (conc. opn. of McComb, J.).) The Commission's decision would deny LT-WR that right. In precluding LT-WR from barring the public from traversing its property on the theory that "potential exists to establish prescriptive rights for public use of this road," the Commission in effect decreed the existence of such prescriptive rights.

 We recognize one of the basic mandates of the Coastal Act is to maximize public access and recreational opportunities within coastal areas. Public Resources Code section 30210 provides: "In carrying out the requirement of Section 4 of Article X of the California Constitution [access to navigable waters], *maximum access*, which shall be conspicuously posted, and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse." (Italics added.) However, the Commission is not vested with the authority to adjudicate the existence of prescriptive rights for public use of privately owned property. In denying LT-WR a permit for the gates and no trespassing signs due to the possibility of prescriptive rights, the Commission in effect gave credence to the claimed prescriptive rights. The Commission's denial of a permit for the gates and signs, premised on the existence of "potential" prescriptive rights, was speculative and properly was overturned by the trial court.

We conclude the trial court properly directed the Commission to vacate its denial of a permit with respect to LT-WR's gates and no trespassing signs.[7]

---

[7] Regardless of the trial court's rationale, because its ruling with respect to the gates and signs is correct in result, it must be upheld. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

## DISPOSITION

The judgment is affirmed. The parties shall bear their respective costs on appeal.

Croskey, J., and Aldrich, J., concurred.

A petition for a rehearing was denied June 21, 2007, and the opinion was modified to read as printed above.